STATE of Minnesota, Respondent,

v.

Kawaskii BLANCHE, Appellant.

No. A03–826.

Supreme Court of Minnesota.

May 26, 2005.

Earl P. Gray, Mark D. Nyvold, St. Paul, MN, for Appellant.

Michael A. Hatch, State Attorney General, St. Paul, MN, Amy Klobuchar, David C. Brown, Hennepin County Attorney, Minneapolis, MN, for Respondent.

## OPINION

ANDERSON, Paul H., Justice.

In 1999, appellant Kawaskii Blanche was convicted and sentenced in Hennepin County District Court for premeditated first-degree murder in connection with the shooting death of 11–year–old Byron Phillips. Blanche was also convicted and sentenced for conspiracy to commit first-degree murder and a crime committed for the benefit of a gang. Blanche did not file a direct appeal, but more than three years after his conviction, he filed a petition for postconviction relief alleging numerous errors by the district court. He specifically alleged racial discrimination because the state used a peremptory challenge to strike a veniremember who appeared to be "Hispanic"; Confrontation Clause violations through the admission of statements by his codefendant in their joint trial; improper joinder of his trial with the trial of his codefendant; prosecutorial misconduct; ineffective assistance of counsel; and erroneous sentencing. The postconviction court denied Blanche's petition for relief. We affirm.

### The Underlying Facts

At around 6:15 p.m. on June 2, 1996, 11–year–old Byron Phillips was playing with his cousin and a friend on the front porch of the friend's North Minneapolis home. While Phillips was playing, a bullet fired from a passing car hit him in the chest. Phillips died at the scene as a result of the shooting.

Phillips' cousin and friend both stated that the passing car was driven by an African American male, who appeared to be in his teens and who wore a baseball type cap. The cousin and the friend disagreed on other details about the driver and they could not remember how many other people may have been in the car. The cousin testified that the car was a full-size blue car with rust spots, but the friend testified that he had seen a full-size red car with rust spots. Neither of the boys was ever asked to identify any individuals or cars in a photographic line-up.

The police recovered ten 9–mm shell casings on a street just west of Phillips' home and some bullet fragments in the surrounding area. Bullets had hit nearby bushes and had gone through the wall of a garage. Forensic evidence showed that seven of the ten shell casings found at the scene had been fired from the same gun and matched shell casings found at the scenes of three recent shootings that had occurred in Minneapolis and Saint Paul on May 17, May 31, and June 1. Witness testimony indicated that these shootings were the result of a feud between two rival gangs: the "Bogus Boyz" and the "Shortys Taking Over" ("S.T.O.").

On May 17 in Saint Paul, Caylon Williams, a member of the Bogus Boyz, shot Richard Smaller. S.T.O. member Corey Scott shot Bogus Boyz member Robert Williams on May 31 in Minneapolis, but did not cause him serious injury. Robert Williams testified that he fired back at

Scott with a gray 9-mm Smith & Wesson semi-automatic handgun that he had found in Caylon Williams' car. Robert Williams was admitted to the hospital with wounds to his face and right arm, and was released the next day. On June 1 in Minneapolis, Caylon Williams, while armed with the same gray 9-mm Smith & Wesson used by Robert Williams, was shot and seriously wounded by Scott. Blanche had been a passenger in Caylon Williams' car. When Caylon Williams was shot, Blanche took over as driver and drove Caylon Williams to the hospital. Robert Williams testified that later that same day, he, Blanche, and some others discussed killing Scott in retaliation for the shooting of Caylon Williams.

Around noon on June 2, Blanche, Montay Bernard, David Allen, and Robert Williams set out to visit Caylon Williams in the hospital. They were driving there in a maroon Nissan Maxima owned by Bernard's mother. Before going to the hospital, Blanche wanted to drive through a part of North Minneapolis near where Scott lived. As they drove through this neighborhood, the four spotted Scott walking down the sidewalk. Williams and Allen got out of the car in an attempt to go after Scott, but they were stopped by police officers responding to a call that there was a man in the area with a gun. The officers arrested Williams and charged him with being a felon in possession of a handgun. Allen was detained, but was released a short time later that day. Blanche and Bernard drove off when Williams and Allen were detained. Later that day, at approximately 6:15 p.m., Phillips was shot and killed.

The police investigation of Phillips' shooting led them to interview Blanche, but he was not charged at that time. The police had several leads, including the shell casings from the gang-related shootings,

but the investigation stalled, and no one was charged with Phillips' murder.

More than a year after the shooting, in July 1997, a woman named Vanessa Gaines came forward with information about Phillips' shooting. Gaines had seen a billboard near her house with a picture of Phillips and a message which read: "You know who killed me. Why won't you help?" Gaines called the police, but hung up the first two times that she called. She testified that she eventually told the police that sometime between 6:00 and 9:00 p.m. on June 2, 1996, she saw her nephew Duan Gaines at her home, talking to Blanche and Bernard. She had not known Bernard's name on June 2, but she identified him at trial. She had recognized Blanche on June 2 because he would hang out with her nephew.

Gaines testified that she overheard the three men talking. She heard Blanche mention a shootout in North Minneapolis with S.T.O. gang members and state his belief that a little boy had been hit with a bullet because he saw the boy fall to the ground. She also saw that Blanche was carrying an automatic handgun. Later that same evening, she saw on the news that a little boy had been killed in a North Minneapolis shootout. At trial, Gaines admitted that she has several criminal convictions and had received reward money for the information that she provided, but she denied that the reward was the reason for her testimony.

In August 1997, Robert Williams told Minneapolis Police Detective David Zimmer that he knew something about the Phillips shooting. Robert Williams, who was incarcerated when he spoke to Zimmer, initially did not talk about Blanche's involvement in the shooting when he first spoke to Zimmer in June 1997. Later, Robert Williams contacted Zimmer through his friend, Caylon Williams, and

requested that Zimmer come to see him. Robert Williams then implicated Blanche and Bernard in Phillips' murder, telling Zimmer that Blanche had said that he and a friend were "rolling over north [Minneapolis]" and bumped into Scott. According to Robert Williams, Blanche said that he only drove the car, that his friends started shooting at Scott, and that this was the incident where Phillips was killed. In return for his testimony, the state granted Williams immunity from being prosecuted for the Phillips shooting and the conspiracy to kill Scott.

After receiving the information from Vanessa Gaines and Robert Williams, the police arrested Blanche and Bernard for Phillips' murder. Both Blanche and Bernard were charged with first-degree murder under Minn.Stat. § 609.185(1) (2004), second-degree murder (drive-by shooting) under Minn.Stat. § 609.19, subd. 1(2) (2004), conspiracy to commit murder (Corey Scott) under Minn.Stat. § 609.175, subd. 2(2) (2004), and crime committed for the benefit of a gang under Minn.Stat. § 609.229, subd. 2 (2004). Allen was also arrested, but he was charged only with conspiracy to commit murder under Minn. Stat. § 609.175, subd. 2(2). On June 30, 1998, a grand jury indicted all three for the foregoing charges. The state then moved to join the trials of Blanche, Bernard, and Allen under Minn. R.Crim. P. 17.03 and Minn.Stat. § 631.035 (2004). Blanche, Bernard, and Allen each opposed a joint trial. The district court granted the state's motion to join the trials of Blanche and Bernard, but denied the state's request to join Allen's trial. Blanche and Bernard were tried together in March 1999.

*Batson Motion*

During jury selection, the state exercised a peremptory challenge against veniremember #4. Noting that the veniremember appeared to be Hispanic and was the first member of a racial minority questioned, Bernard's counsel raised a *Batson* challenge, which Blanche's counsel joined. Defense counsel asserted that the state's exercise of the peremptory challenge was racially discriminatory.

The state justified its use of a peremptory challenge by arguing that veniremember #4 was "evasive or unresponsive in a way which caused [the state] concern about [the veniremember's] attentiveness to some of the questions." The state also argued that the veniremember did not give direct or logical explanations about how he assessed credibility, and that the veniremember was "laboring over responses," causing the state concern about the veniremember's capacity to make credibility assessments. Defense counsel argued that the veniremember's service on two previous juries, including one the previous week, indicated that two other prosecutors had found that the veniremember had the capacity to make appropriate decisions.

The state countered that its concerns over the veniremember's capacity to make credibility assessments were race neutral. The state also argued that previously sitting on a jury does not mean that the prosecutors in those cases approved of this veniremember. Moreover, the state suspected that, when the veniremember served as a juror in a case the previous week, he and the jury had not appropriately followed the law. Following a recess, the state told the court that after speaking with the prosecutor in the earlier case, it confirmed that the veniremember had served on the panel that the prosecutor in that case believed had not appropriately followed jury instructions.

The district court concluded that it would not base its decision on the *Batson* challenge on any information regarding the veniremember's service on other jury

panels because that information "became known to [the state] through [an outside source], not through any questioning of this juror." The court did not conduct the three-step *Batson* analysis on the record, but concluded that, under the totality of the circumstances, there was not "any inference" that the peremptory challenge was brought for any racial reason—step one of *Batson*. The court therefore allowed the peremptory challenge.

### Robert Williams' Testimony and Letter

The state called numerous witnesses who testified that Blanche and Bernard told them about their involvement in the Phillips shooting. Among those witnesses was Robert Williams, who identified himself as a Bogus Boyz gang member at the time of the shooting. Williams testified about the information that he had previously given the police which implicated Blanche and Bernard in Phillips' murder. On cross-examination by Bernard's counsel, Williams admitted that while in prison in September 1997, he wrote a letter to Blanche. Bernard moved for admission of the letter without objection. In the letter, Williams told Blanche that the "feds" had been investigating the Bogus Boyz and knew "about the little boy and everything." Williams wrote that he did not want to do any time in prison and that he "told [the police] what [he knew] so Montae [sic] will only go down for that [crime]." Later, Blanche's counsel also cross-examined Detective Zimmer about the letter. Zimmer admitted that Williams' letter to Blanche was written in his presence and with his help, and that the letter's content was designed to lead anyone who read it to believe that Blanche knew what Williams was talking about, despite its vague reference to the shooting.

### Bernard's Statements

The state also called witnesses to testify to incriminating statements made by Ber-

nard. Monta Davis, who is both Robert Williams' cousin and related to Phillips, testified that he had been a member of another gang, but had hung out with members of the Bogus Boyz. Davis testified that in February 1998, while he and Bernard were in the "workhouse," Bernard admitted to him he was involved in Phillips' death—that "him and one of his friends" had "got into a shoot out" with Scott while Bernard drove his mother's car. Davis testified that Bernard told him that Scott had been the intended target, but that a friend named Jamoke Jackson had told Bernard that a little boy had been killed instead. According to Davis, Bernard also told him that he had been shooting a 9-mm "high point" gun and his friend was using a gray 9-mm Smith & Wesson. After the shooting, Bernard and his friend went to Allen's house in North Minneapolis and then to Peavey Park in South Minneapolis.

Detective Charles Kelly likewise testified that in his interview with Davis, Davis had told him of Bernard's statements about the shooting. Kelly also stated that he had no independent verification of the content of conversations between Davis and Bernard nor any proof that they took place.

### Other Witnesses

Duan Gaines testified that in 1996 he was a member of the Bogus Boyz gang and that, on the night before Phillips was shot, he had been involved in a plan to shoot Scott. But in response to the state's questions, Gaines recanted much of his earlier grand jury testimony. Gaines admitted that he had testified to the grand jury and told Detective Zimmer in 1998 that on the evening Phillips was shot, Blanche and Bernard had come to his aunt's house and asked for a change of clothes. But at trial, Gaines stated that no one had come to his aunt's house on June 2

and that his testimony to the grand jury was what his attorney had told him to say. Gaines also denied the truth of his previous grand jury testimony where he stated that, during a conversation in Peavey Park shortly after Phillips' murder, Blanche said, "I wasn't the only one shooting." Over objections by both Blanche and Bernard, the state elicited from Gaines that in 1998 he told Zimmer that Bernard had said to Blanche, "We should have got out. You saw whoopty fall." Blanche responded, "Nathan, I'm dumping on Snyp. You saw he was dumping back." Earlier, Gaines had testified that "Snyp" was a nickname for Caylon Williams.

Another witness, whose testimony has not been challenged by Blanche on appeal, testified that a "couple [of] days" after Phillips was shot, this witness overheard Blanche tell Gaines to "keep his mouth shut," that Gaines should not "be running around here telling females that, * * * we had shot this little kid; that we supposed to have been the one that shot the little kid." This witness was also a Bogus Boyz gang member with multiple felony convictions.

Another witness, Sid Strickland, whose direct testimony has also not been challenged in this appeal, testified that while he was in prison, Blanche told him that "they had gotten into some problems with [Scott]. And when they seen him, they shot at him, and a little boy ended up wounded, got shot." Strickland also testified that Blanche admitted to him that, when the incident took place, he had the "9"—a 9–mm handgun. On cross examination, when Blanche's counsel was attempting to discredit his testimony, Strickland spontaneously said, "[Blanche] sold bags to me and numerous amounts of things." Blanche's counsel did not object to Strickland's comment. Strickland also admitted that he testified because of an agreement that could help him get a reduction in his sentence for a separate crime.

*Gang–Expert Testimony*

Lieutenant Michael Martin, a former investigator for the gang unit in the Minneapolis Police Department, testified as an expert witness on gang culture. Martin began by testifying about general gang characteristics and some specific characteristics about the Bogus Boyz and the S.T.O.'s. Martin then testified that he had investigated gang activities where rival gang members assaulted or shot at each other. Martin said that, to maintain their respect within the community, gang members have to retaliate if a gang member is involved in an incident with a rival gang. In general, according to Martin, gangs are not cooperative with the police; instead, gang members "get even" on their own.

On cross-examination by Bernard's counsel, Martin reiterated his earlier testimony that gang members generally do not talk to the police. In response to a question by Bernard's counsel asking him to define a gang, Martin provided the general law enforcement definition of a gang. *See* Minn.Stat. § 609.229, subd. 1 (2004). Also on cross-examination, Martin testified that while gang members generally do not cooperate with the police, there are exceptions. Martin agreed with Bernard's counsel that "some gang members will falsely accuse other gang members of a crime." On redirect, the state attempted to clarify Martin's testimony, asking him, "Have you had experience with gang members falsely accusing people within their own gang of crimes?" Martin responded that he had never had experience with gang members falsely accusing their own gang members of crimes. On recross by Bernard's counsel, Martin also agreed that gang members will accuse nongang members of crimes

because there is no loyalty to nongang members.

*Videotaped Statements of Blanche and Bernard*

The state introduced as evidence a videotape containing excerpts from separate interviews investigators conducted with Blanche and Bernard. The videotape was played for the jury with instructions to the jurors that they could consider Bernard's and Blanche's statements only as they related to each defendant's own case and not the other's case. Part of the videotape contained a statement by Bernard that had been redacted shortly after the point when detectives asked him whom he picked up in his car on the morning of June 2, 1996. Bernard says "Robert Williams"; the tape then skips and the next words Bernard says are "David Allen." During jury deliberations, the jurors sent the following note to the district court: "We noticed that a name was edited out of the Montay Bernard's video testimony statement to the police. Would this normally be done so as not to implicate the other defendant?" The record indicates that in response to this inquiry, the court sent the jury the following note: "Any editting [sic] on the tape was done at the direction of the court according to the rules of law. And you should not concern yourself with it."

*Adjudication and Sentencing*

The jury found Blanche guilty on all four counts—first-degree murder, second-degree murder (drive-by shooting), conspiracy to commit murder, and crime committed for the benefit of a gang. The jury found Bernard guilty of two counts—conspiracy to commit murder and crime committed for the benefit of a gang.[1] The district court sentenced Blanche to the mandatory sentence of life imprisonment for premeditated first-degree murder, the presumptive sentence of 180 months for the conspiracy against Scott to commit first-degree murder, and added the mandatory minimum of 12 months and 1 day to his life sentence for a crime committed for the benefit of a gang. The court, making an upward sentencing departure, ordered these sentences to run consecutively to each other and consecutively to a federal sentence that Blanche was serving until April 11, 2000, for being a felon in possession of a firearm. The court stated that it chose in its discretion to make the sentences consecutive and specifically listed several factors: the existence of multiple victims, both intended and unintended; Phillips' vulnerability and complete innocence; the violation of Phillips' zone of privacy; the emotional and psychological devastation to the community of repeated random shootings in residential areas in an attempt to assassinate Corey Scott; the harm to the community resulting from the senseless and brutal killing of an innocent child; and Blanche's apparent lack of remorse and responsibility. Blanche did not file a direct appeal and his conviction became final on July 12, 1999.

*Postconviction Review*

In December 2002, Blanche filed a petition for postconviction relief. He alleged racial discrimination because the state used a peremptory challenge to strike a veniremember who appeared to be "Hispanic"; Confrontation Clause violations through the admission of statements by his codefendant in their joint trial; improper

---

1. Bernard was sentenced to consecutive sentences of 200 months for conspiracy to commit murder and one year and one day for crime committed for the benefit of a gang. Bernard's conviction and sentence were affirmed by the Minnesota Court of Appeals in 2000. *State v. Bernard*, 2000 WL 1015418 (Minn.App.), *rev. denied* (Minn. Sept. 27, 2000).

joinder of his trial with the trial of his codefendant; prosecutorial misconduct; ineffective assistance of counsel; and erroneous sentencing.

The same judge who presided at Blanche's trial heard the postconviction petition. The state argued to the postconviction court that Blanche's petition was barred because all the issues raised were available during the time frame for a direct appeal and that the state would be unduly prejudiced by the delay if a new trial were granted. The postconviction court, in an Order and Memorandum filed June 11, 2003, concluded that Blanche was entitled to have the issues he raised considered on postconviction review on the ground that a convicted defendant has the right to at least one substantive review. The court also concluded that, under the circumstances of this case, the delay between Blanche's conviction and any decision on postconviction relief was not excessive enough to entitle the state to an automatic dismissal of the petition based on prejudice.

The postconviction court nevertheless denied and dismissed Blanche's petition without a hearing, concluding that Blanche was not entitled to relief. Blanche appealed and on December 3, 2003, we heard oral arguments. Following the hearing, on December 18, 2003, we remanded the issue of Blanche's ineffective assistance of counsel claim to the postconviction court to hold an evidentiary hearing. We also stayed Blanche's appeal and retained jurisdiction over the other issues.

At a hearing held July 7, 2004, Blanche called only one witness, his trial counsel, Demetrius Clemons. The state did not call any witnesses. Clemons testified that he did not remember many of his actions or tactical decisions he had made during the trial. The state attempted to show that Clemons' representation had not been

unreasonable. After the hearing, the postconviction court determined that Blanche failed to establish that his trial representation fell below an objective standard of reasonableness and that, but for trial counsel's errors, the outcome would have been different.

On appeal, Blanche requests a new trial based on alleged errors committed by the district court during his trial. The state requests that the postconviction court's decision denying relief be affirmed. In the alternative, if we conclude that Blanche is entitled to a new trial based on the merits of the petition, the state requests we consider whether it would be unduly prejudiced by a new trial because of Blanche's delay in seeking review.

## I.

We first consider the district court's denial of Blanche's *Batson* motion. Blanche asserts that the state's peremptory challenge of veniremember #4 was racially discriminatory in violation of the Equal Protection Clause. *See Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

In *Batson,* the United States Supreme Court established a three-step test to determine whether a peremptory challenge discriminates on the basis of race. 476 U.S. at 96–98, 106 S.Ct. 1712. In *Purkett v. Elem,* the Court summarized the analysis as follows:

once the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the

strike has proved purposeful discrimination.

514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (citation omitted).[2] Here, the district court concluded that Blanche failed to establish a prima facie case because there was no inference of racial discrimination—step one of *Batson*.

■ Because a district court is in a unique position to determine whether the circumstances of a peremptory challenge give rise to an inference of discrimination, we will reverse a district court's decision only if there was clear error. *State v. White*, 684 N.W.2d 500, 506–07 (Minn. 2004). A prima facie case of racial discrimination in a peremptory challenge is established by showing (1) that a member of a protected racial group has been peremptorily excluded from the jury and (2) that circumstances of the case raise an inference that the exclusion was based on race. *State v. Taylor*, 650 N.W.2d 190, 201 (2002). In *Batson*, the Supreme Court held that a trial court should consider all relevant circumstances in deciding whether an inference of discrimination might exist. 476 U.S. at 96–97, 106 S.Ct. 1712 (listing as examples: a pattern of strikes against racial-minority jurors, the prosecutor's questions, and statements made during voir dire examination). The mere fact that the veniremember is the first member of a racial minority to be considered is not enough by itself to raise an inference of racial discrimination. *See State v. Bowers*, 482 N.W.2d 774, 776–77 (Minn.1992). Further, an excluded veniremember and the defendant need not be of the same race in order to raise an inference that the peremptory strike was based on race. *State v. Scott*, 493 N.W.2d 546, 548 (Minn.1992)

(citing *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991)).

■ Blanche argues that the state's strike of veniremember # 4 gave rise to an inference that the veniremember's exclusion was based on race because: (1) the veniremember, who appeared to be "Hispanic," was the first member of a racial minority to be considered, (2) the veniremember disclosed that his aunt was married to an African American male, and (3) the state's questioning of the veniremember showed that it was concerned with the veniremember's race. Blanche argues that the state asked the prospective juror "broad, open-ended questions that were obviously intended to * * * provide a basis for a challenge for cause, or a supposedly race-neutral reason for a peremptory strike." Blanche claims that this veniremember's questions were different from the types of questions that the state had asked during its examination of other veniremembers.

The postconviction court, which was the same court that presided at Blanche's trial, elaborated on its decision regarding the *Batson* motion and found that there was a lack of explicit racial overtones to the case. The court noted that both defendants, the victim, the intended victim, and most of the witnesses were African American. The court further observed that at the time the state questioned veniremember # 4, there were still three African American veniremembers to be evaluated. The court found that the state's strike of veniremember # 4 would make any other attempt to challenge minority veniremembers, especially the three African American veniremembers, significantly more suspect. The court then concluded that there was insufficient evidence to con-

**2.** The three-step *Batson* analysis has been incorporated into our rules of criminal proce-

dure in Minn. R.Crim. P. 26.02, subd. 6a(3).

clude that the state's strike was racially motivated.

Although the district court decided the *Batson* issue on the first step of the *Batson* test, the postconviction court also analyzed the second and third steps, apparently mindful of *Hernandez v. New York*, in which the Supreme Court held that if the striking party proceeds past the first step by offering a race-neutral reason without questioning the objecting party's prima facie showing, the outcome of step one is moot. 500 U.S. 352, 359, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991); *see also State v. James*, 520 N.W.2d 399, 402 (Minn.1994); *Scott*, 493 N.W.2d at 548. The court determined that the state's reasons for the peremptory challenge—that veniremember # 4 was evasive, unresponsive, inattentive, gave labored answers, and left the state concerned about his ability to make credibility assessments—were race-neutral. The court also determined that the state's questions were legitimate to juror evaluation.

The postconviction court also noted as "background" that the district court had taken "extreme measures" in Blanche and Bernard's trial, which it had "never before or since taken * * * to assure the racial diversity of a jury panel in any case it has tried." After reviewing the initial randomized ordering of over 100 veniremembers, the court noticed that there had been only three African Americans on the list. Of the three, one had been removed from the list after arriving late and the other two had been placed near the bottom of the list. The court ordered the previously removed veniremember to be reinstated and ordered that the randomized order be rerun. Ultimately, all three African Americans were impaneled on the jury.

■ We have carefully reviewed the record and we conclude that the state's questioning of veniremember # 4 and the veniremembers before him does not reveal any material differences in the way questions were framed. We see no clear basis for an inference of racial discrimination. In questioning veniremembers, parties have "considerable latitude" in the types of questions that they may ask. *See Bowers*, 482 N.W.2d at 777. The state had asked each of the previous veniremembers how they evaluate credibility. Blanche's nonspecific assertions of a *Batson* violation are insufficient to demonstrate any impropriety in the questions asked. Moreover, we agree with the postconviction court that the state's use of a peremptory challenge on veniremember # 4 made any future peremptory challenge on a member of a racial minority more suspect. This circumstance made racial discrimination in the strike of this veniremember less likely. Accordingly, for all of the foregoing reasons, we hold that the district court did not clearly err when it overruled Blanche's objection to the state's peremptory challenge because the circumstances of the state's strike of veniremember # 4 did not raise an inference that the veniremember's exclusion was based on race.

## II.

■■ Next, we address Blanche's claim that the district court erred because it violated his Sixth Amendment Confrontation Clause rights under the rule in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Blanche asserts that the court erred when it admitted statements of codefendant Bernard through the testimony of Monta Davis, Detective Charles Kelly, and Duan Gaines, and a redacted videotape of Bernard's police interview. We review de novo whether admitted testimony violates a defendant's Confrontation Clause rights. *State v. King*, 622 N.W.2d 800, 806 (Minn.2001). If evidence has been admitted in violation

of the Confrontation Clause, it is subject to harmless error analysis. *Id.* at 809. Error is harmless if the verdict rendered was "surely not attributable to the error." *State v. Stewart,* 643 N.W.2d 281, 295 (Minn.2002).

■ *Bruton* established the rule that when two defendants are tried jointly, the pretrial confession of one, which implicates the other defendant, cannot be admitted against the other defendant unless the confessing codefendant testifies at trial. 391 U.S. 123, 135–37, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Admitting such a confession when the codefendant does not testify is a violation of the other defendant's Confrontation Clause rights. *Id.* at 136, 88 S.Ct. 1620. Furthermore, instructing the jury to consider the confession only against the confessing codefendant is an insufficient remedy because a confession that directly implicates the other defendant is so powerfully incriminating. *Id.* at 135–36, 88 S.Ct. 1620.

Following *Bruton,* the Supreme Court has provided some parameters on how a codefendant's confession can be admitted into evidence in a joint trial. In *Richardson v. Marsh,* the Court stated that the protective rule of *Bruton* is a narrow exception to the general principle that jurors follow jury instructions. 481 U.S. 200, 207, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). In *Marsh,* the Court held that the admission of a codefendant's confession did not violate the other defendant's Confrontation Clause rights because the admitted version of the confession was "redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Id.* at 211, 107 S.Ct. 1702. The Court stated that the redaction, which did not expressly implicate the defendant, created an important distinction to *Bruton* because the confession became incriminating only when linked with other evidence introduced later

at trial. *Id.* at 208, 211, 107 S.Ct. 1702. The Court also held that the jury must be provided a proper limiting instruction that the codefendant's confession cannot be used against the other defendant. *Id.* at 211, 107 S.Ct. 1702.

In *Gray v. Maryland,* the Supreme Court decided a question it had reserved ruling on in *Marsh*—whether replacing the defendant's name "with an obvious indication of deletion, such as a blank space, the word 'deleted,' or a similar symbol," is prohibited under *Bruton's* protective rule. 523 U.S. 185, 192, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998). Although the redaction in *Gray* was not incriminating on its face, the Court expressed its concern that jurors "will often realize that [a confession such as this] refers specifically to the defendant" and such an obvious deletion "may well call the jurors' attention specially to the removed name." *Id.* at 193, 118 S.Ct. 1151. The Court elaborated:

> A juror who does not know the law and who therefore wonders to whom the blank might refer need only lift his eyes to [the defendant], sitting at counsel table, to find what will seem the obvious answer, at least if the juror hears the judge's instruction not to consider the confession as evidence against [the defendant], for that instruction will provide an obvious reason for the blank. A more sophisticated juror, wondering if the blank refers to someone else, might also wonder how, if it did, the prosecutor could argue the confession is reliable, for the prosecutor, after all, has been arguing that [the defendant], not someone else, helped [the codefendant] commit the crime.

*Id.* Minn. R.Crim. P. 17.03, subd. 3(2)(b), follows the *Bruton* line of cases requiring that in a joint trial, a codefendant's confession can be received into evidence "only after all references to the defendant have

been deleted, if admission of the statement with the deletions will not prejudice the defendant." [3].

The Eighth Circuit Court of Appeals has also provided some analysis on what falls under *Bruton's* protective rule. In *United States v. Logan,* a detective testifying about a codefendant's confession replaced the name of the defendant in the confession with the words "another individual." 210 F.3d 820, 821 (8th Cir.2000). The Eighth Circuit distinguished *Gray,* stating that the use of the words "another individual" in place of the defendant's name was not a redaction and did not draw attention to the change. *Id.* at 823. Noting that the detective's testimony was only oral and that "the allegedly offending phrase occurred only once," the Eighth Circuit concluded that the inference was not the kind of statement that was so "powerfully incriminating" that required it to abandon the normal presumption that juries follow their instructions. *Id.*

We interpret *Logan* to require a case-by-case analysis of the prejudice to the defendant resulting from an altered statement that is not a redaction of the type that was specifically found impermissible in *Gray.* Although we do not expressly adopt *Logan,* we agree with its apparent conclusion that the primary concern in *Bruton* is the prejudice the confessing codefendant's allegedly offending statement causes the other defendant. The Supreme Court stated its concern that redacted or altered statements should not, by themselves, draw attention to the other defen-

dant. *See Gray,* 523 U.S. at 193, 118 S.Ct. 1151. In *Marsh,* the Court determined that the codefendant's confession was admissible because it only became incriminating when it was linked with evidence introduced later at trial and only because the appropriate limiting instruction had been provided. *See Marsh,* 481 U.S. at 211, 107 S.Ct. 1702.

Blanche specifically argues that the admission of Davis's testimony, Detective Kelly's testimony repeating what Davis said, Duan Gaines's testimony, and the videotaped statement by Bernard all violated his rights under *Bruton.* We will separately analyze each of the allegedly offending statements.

*Davis's and Kelly's Testimony*

■ Davis and Kelly both testified about conversations that Davis had with Bernard, in which Bernard stated that he and a "friend" had been involved as shooters targeting Scott and that Jamoke Jackson told Bernard that a little boy had been shot. Blanche asserts that, based on the testimony of other witnesses, only he could have been the "friend" to whom Bernard was referring.

Under the circumstances of the case, we conclude that the use of the word "friend" was not prejudicial to Blanche because the reference by itself did not implicate Blanche. The testimony did not contain an obvious edit and did not draw particular attention to the word chosen. More importantly, witnesses gave testimony that numerous gang members or associates

---

**3.** The rule provides that where a defendant moves for severance and the state intends to offer the statements of a codefendant that refer to the defendant but are not admissible against the defendant,

 the court shall require the prosecuting attorney to elect one of the following options:

 (a) a joint trial at which the statement is not received in evidence;

 (b) a joint trial at which the statement is received in evidence only after all references to the defendant have been deleted, if admission of the statement with the deletions will not prejudice the defendant; or

 (c) severance of the defendant.

were involved in targeting Scott; thus, the "friend" could have been any one of almost a dozen gang members or associates. Only when linked to other testimony does the reference suggest that Blanche is most likely the "friend." Having reached this conclusion, we nevertheless caution the state that substituting the word "friend" or something similar will not in all cases eliminate a *Bruton* violation. In other instances, it may be obvious that the "friend" could refer only to the defendant. But, in this case, we conclude that the use of "friend" was not improper in the context of Davis's and Kelly's testimony.

*Duan Gaines's Testimony*

 Blanche also argues that his Sixth Amendment rights were violated when Duan Gaines testified that Bernard said to Blanche, "We should have got out. You saw whoopty fall." We disagree with the postconviction court's conclusion that Gaines's statement was so nebulous that the jury could not possibly infer that the statement meant something to the effect that Bernard and Blanche should have gotten out of the car before shooting at Scott so as to have avoided hitting Phillips.[4] Further, we do not subscribe to the notion that *Bruton's* protections only cover statements that are formal confessions, such as those in which the defendant directly admits guilt in the context of a formal statement. Therefore, we conclude that the admission of Gaines's statement over Blanche's objection was error. At worst, however, this testimony was cumulative and therefore harmless. If the jury's verdict was in any part based on Gaines's testimony, his testimony included other statements, which were admissible against Blanche and in which Blanche identified

himself as a shooter. *See U.S. v. Payne*, 923 F.2d 595 (8th Cir.1991) (holding that admission of a redacted statement in violation of *Bruton* was harmless error where other evidence made the statement largely cumulative). Therefore, we conclude that the error was harmless because the guilty verdict was surely unattributable to the error.

*Bernard's Videotaped Statement*

 Finally, Blanche contends that admission of the edited videotape of Bernard's statement violated his Confrontation Clause rights. We agree that the type of redaction used on the videotape offends the concerns raised in *Bruton*. Erasing Blanche's name did not eliminate all reference to him. As evidenced by its question to the district court, the jury noticed the redaction and correctly inferred that the erasure was Blanche's name. Nevertheless, we do not conclude that Blanche's Sixth Amendment Confrontation Clause rights were violated by admission of the videotape because, while *Bruton's* protections apply more broadly than just formal confessions, they nevertheless require that the statement be a confession that is prejudicial to the defendant. *See Bruton*, 391 U.S. at 137, 88 S.Ct. 1620. Bernard's statement on the video was not a confession even in the broadest sense. Although the videotape erasure appeared to name Blanche, it only placed him in the same automobile with Bernard around noon on June 2, 1996—six hours before the shooting. Therefore, we conclude that, without other evidence, Bernard's statement on the videotape alone does not implicate Blanche. However, we strongly caution against the kind of editing

---

4. Here, we note that we believe that Blanche's response—"Nathan, I'm dumping on Snyp. You saw he was dumping back"— contains greater ambiguity because the rec-

ord does not provide any explanation who "Nathan" is or why Blanche would be referring to "Snyp" (Caylon Williams).

that occurred here, and express our concern that the edit drew more attention to Blanche than would have been drawn if Blanche's name had simply remained in Bernard's statement.

*Limiting Instructions*

We are also concerned that the district court did not explicitly instruct the jury in its final instructions that Bernard's statements, whether provided through the testimony of other witnesses or by Bernard directly, could not be used against Blanche. The *Bruton* line of cases explicitly stresses the importance of limiting jury instructions. When the videotape was played, the court instructed the jury as follows: "[Y]ou can consider the statements of Mr. Bernard and Mr. Blanche only as they relate to their own case. So you should not consider, for instance, Mr. Blanche's statements in Mr. Bernard's case. And you should not consider Mr. Bernard's statements in Mr. Blanche's case." But when the court gave the jury instructions, the court generally stated that each defendant's case must be tried separately and that the jury "should analyze what the evidence shows with respect to that defendant, leaving out of consideration entirely any evidence admitted solely against the other defendant." [5] The court should have provided specific limiting instructions both at the time the evidence was introduced and when providing final instructions to the jury. We nevertheless conclude that here the combination of the

instructions provided by the court was sufficient to provide Blanche the protections required by *Bruton*. *See State v. White*, 684 N.W.2d 500, 509 (Minn.2004) (explaining that jury instructions are not in error when, viewed in their entirety, they fairly and adequately explain the law of the case).

Based on the foregoing, we hold that Blanche's Sixth Amendment Confrontation Clause rights were not violated by admission of Davis's testimony, Detective Kelly's testimony, Duan Gaines's testimony, or the videotaped statement by Bernard.

### III.

Blanche also argues that the district court erred when it joined Blanche's trial with Bernard's, claiming that the court incorrectly determined that there were no *Bruton* violations or other unfairly prejudicial issues, including the letter from Robert Williams to Blanche, requiring separate trials. In reviewing a court's pretrial decision regarding joinder, we make "an independent inquiry into any substantial prejudice to defendants that may have resulted from their being joined for trial." *State v. DeVerney*, 592 N.W.2d 837, 842 (Minn.1999) (quoting *State v. Hathaway*, 379 N.W.2d 498, 502 (Minn. 1985)). If joinder was erroneous, it is subject to harmless error analysis. *Santiago v. State*, 644 N.W.2d 425, 450 (Minn. 2002).

---

5. The court instructed the jury:

It is your duty to give separate and personal consideration to the evidence as to the case of each individual defendant. That means that you must assess the evidence that has been received separately as to Mr. Bernard and as to Mr. Blanche as to each charged offense. When you do so, you should analyze what the evidence shows with respect to that defendant, leaving out of consideration entirely any evidence admitted solely against the other defendant. A separate crime is alleged against each defendant in each count of the indictment. Each alleged offense and any evidence pertaining to it should be considered separately by the jury. Each defendant is entitled to have his case determined from evidence as to his own acts, statements and conduct, and any other evidence in the case that may be applicable to him.

Pretrial joinder is governed by Minn. R.Crim. P. 17.03, subd. 2(1), which requires the district court to analyze four factors when determining whether to order joint trials. *See Santiago*, 644 N.W.2d at 444 (concluding the procedural rules are controlled by the rules of criminal procedure rather than statute). The rule provides in relevant part:

When two or more defendants are jointly charged with a felony, they may be tried separately or jointly in the discretion of the court. In making its determination on whether to order joinder or separate trials, the court shall consider [1] the nature of the offense charged, [2] the impact on the victim, [3] the potential prejudice to the defendant, and [4] the interests of justice.

Minn. R.Crim. P. 17.03, subd. 2(1). The district court analyzed each of these factors and determined that the joinder of Blanche and Bernard was appropriate. We will analyze each of these four factors in turn.

*Nature of the Offense Charged*

 Joinder is appropriate when codefendants act in close concert with one another. *DeVerney*, 592 N.W.2d at 842. We agree with the district court that, here, the nature of the offense favored joinder. Blanche and Bernard were charged with the same crimes and the great majority of the evidence presented was admissible against both Blanche and Bernard. Evidence was presented that Blanche and Bernard each played a role in the conspiracy to kill Scott, were both in the vehicle, and were both shooters.

*The Impact on the Victims*

 In our analysis of this factor, we have considered the impact on both the victim of the crime as well as the trauma to the eyewitnesses who would be compelled to testify at multiple trials. *See State v. Powers*, 654 N.W.2d 667, 675 (Minn.2003). While Rule 17.03, subd. 2(1), does not explicitly include the impact on the eyewitnesses to the crime, we nevertheless conclude that, while close, this factor favored joinder. Two of the witnesses were young children who saw the shooting and watched their young friend and cousin die. We agree with the district court that subjecting these children to giving testimony at separate trials for Blanche and Bernard would have been "unduly harsh." Moreover, these two witnesses, only by chance, avoided being shot themselves. Our conclusion here does not suggest that this factor should be swallowed by considerations of eyewitness convenience; we only conclude that in a case like this one, where the eyewitnesses were vulnerable and could be traumatized by having to testify at several trials, a court may consider the potential trauma to the eyewitness.

*The Potential Prejudice to the Defendant*

 The third factor is the key factor in Blanche's argument. Blanche asserts that he was prejudiced by Bernard's statements that were not admissible against him and the introduction of Robert Williams' letter implicating him in Phillips' murder.

Because we have already held that the alleged *Bruton* statements were either not error or were harmless error, we conclude that Blanche suffered no prejudice based on Bernard's statements. Therefore, Blanche was not prejudiced by joinder based on the alleged *Bruton* statements.[6] Moreover, we note that, at the time the

---

6. Therefore, neither was Blanche prejudiced by the failure of his counsel to request severance midtrial based on the alleged *Bruton* violations.

district court made its decision to join the two trials, Blanche had not specified which statements might be admitted that would potentially violate *Bruton.* A district court does not err because of the possibility, as Blanche alleged, of offending *Bruton* statements. Denying joinder on this possibility alone is simply an argument against joinder generally. *See* Minn. R.Crim. P.. 17.03, subd. 2(1) (giving the court discretion in determining whether to try two or more defendants jointly).

Blanche also contends that Bernard's introduction of Robert Williams' letter was unduly prejudicial because the letter was written to show that Blanche knew about and was involved in Phillips' murder. Because Detective Zimmer directed William to write the letter, its introduction did not prejudice or create antagonistic defenses between Blanche and Bernard. Rather, Blanche used the letter and Zimmer's involvement in its preparation to support Blanche's theory that the state was manipulating evidence to reach the result that it wanted. We therefore conclude that Bernard's introduction of the letter was not prejudicial to Blanche.

*The Interests of Justice*

 The district court also found that the interests of justice weighed in favor of joining Blanche's and Bernard's trials. Bernard's and Blanche's defenses were not antagonistic. *See Hathaway,* 379 N.W.2d at 503 (defining antagonistic defenses). Bernard's main defense was that he was at home at the time of the shooting. And, at more than one point in the trial, Bernard pointed the finger at other gang members as the shooters. Moreover, because both trials involved testimony by gang members, the risk existed that these witnesses

would not have been available at a second trial.

Based on our analysis of the four factors articulated in Rule 17.03, subd. 2(1), we hold that the district court did not err in granting the state's motion for joinder.[7] Nevertheless, we caution, as we did in *Santiago,* that Minnesota law does not have a presumption in favor of joinder. *See* 644 N.W.2d at 445–46.

## IV.

Next, we consider whether Lieutenant Martin's gang-expert testimony was properly admitted. Blanche argues that, under Minn. R. Evid. 403, Martin's testimony was improper because it was unfairly prejudicial and largely cumulative of the other witnesses' testimony about how the Bogus Boyz operated as a gang. Counsel for both Blanche and Bernard objected to Martin's testimony before he testified. The district court denied defense counsels' motions, stating that Martin's testimony would be helpful to the jury because gang culture is outside of their normal experiences.

 Under Minn. R. Evid. 702, we allow expert testimony if the testimony will assist the jury in evaluating evidence or resolving factual issues. *State v. Grecinger,* 569 N.W.2d 189, 195 (Minn.1997). The admissibility of expert testimony generally rests within the sound discretion of the district court. *State v. Koskela,* 536 N.W.2d 625, 629 (Minn.1995). Because of this discretion, we review the admissibility of gang-expert testimony for clear error, which is subject to harmless error analysis. *State v. DeShay,* 669 N.W.2d 878, 884–85 (Minn.2003); *State v. Lopez–Rios,* 669 N.W.2d 603, 613 (Minn.2003).

---

7. Blanche has not argued that the district court erred when it denied Blanche's two midtrial motions for severance based on a

prejudicial article reported in the Star Tribune and on Martin's testimony on gangs.

■ In *DeShay* and in *Lopez–Rios,* we cautioned courts that gang-expert testimony should be admitted only if it is helpful to the jury in making the specific factual determinations that jurors are required to make. *DeShay,* 669 N.W.2d at 884; *Lopez–Rios,* 669 N.W.2d at 613. To be admitted, gang-expert testimony must

add precision or depth to the jury's ability to reach conclusions about matters that are not within its experience. Moreover, the [district] court must carefully monitor this testimony so that the testimony will not unduly influence the jury or dissuade it from exercising its independent judgment. Even if acceptable under Rule 702, expert testimony should be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.

*DeShay,* 669 N.W.2d at 888 (citing Minn. R. Evid. 403).

In both *DeShay* and *Lopez–Rios,* we held that the admission of expert testimony on general gang activities and gang affiliation was erroneous. *DeShay,* 669 N.W.2d at 888; *Lopez–Rios,* 669 N.W.2d at 613. In *DeShay,* we held that much of the gang expert's testimony was erroneously admitted because it was largely duplicative, giving little assistance to the jury in evaluating the evidence in a "noncomplex drug conspiracy case." 669 N.W.2d at 888. In *Lopez–Rios,* we held that much of the gang expert's testimony on general gang activities and gang affiliation was erroneously admitted as it was largely duplicative of previous witness testimony, and we also found troublesome the expert's testimony that the defendant was a member of a criminal gang. 669 N.W.2d at 612–13.

Blanche was charged with a crime committed for the benefit of a gang under Minn.Stat. § 609.229, subd. 2 (2004).[8] To be admissible here, the gang expert's testimony must have been helpful to the jury in making factual determinations related to this charge, and the probative value must not have been substantially outweighed by the danger of unfair prejudice.

■ Blanche argues that Martin's testimony was prejudicial because Martin testified about criminal activities in which gangs generally engage, which, by inference, meant that these were criminal activities in which Bogus Boyz gang members engaged. Indeed, Martin testified that gang members shoot at each other. Martin also testified that if a gang member is involved in an incident with a rival gang, members of his gang have to retaliate in order to maintain their respect within the community and the gang subculture. Martin further testified that, in general, gang members do not cooperate with the police. Responding to defense counsel's questions on cross-examination, Martin said that he had never had any personal experience with gang members who falsely accuse people within their own gangs of crimes.

Like *DeShay* and *Lopez–Rios,* this was a case that required the jurors, as fact finders, to decide only certain specific factual issues in order to determine whether Blanche committed a crime for the benefit of a gang under Minn.Stat. § 609.229, subd. 2. We recognize that the district court did not have the benefit of our holdings in *DeShay* and *Lopez–Rios* when it allowed Martin to testify; we nevertheless conclude that the court erred by allowing

---

8. Minnesota Statutes § 609.229, subdivision 2 (2004), provides that a person who "commits a crime for the benefit of, at the direction of, in association with, or motivated by involvement with a criminal gang, with the intent to promote, further, or assist in criminal conduct by gang members is guilty of a crime."

much of Martin's testimony because the testimony was largely duplicative and unfairly prejudicial. In particular, Martin's testimony that gang members retaliate against other gangs by shooting at each other was prejudicial because there was a risk that the jury would improperly use this evidence to conclude that Blanche was the shooter simply because he is a member of a gang.

We are especially troubled by Martin's testimony that gang members generally do not falsely accuse their own gang members of crimes. Martin's testimony bordered on vouching for the testimony of Bogus Boyz gang member Robert Williams, implying that Williams was necessarily telling the truth in his testimony because Blanche belonged to the same gang as Williams. *See Van Buren v. State,* 556 N.W.2d 548, 551–52 (holding that district court committed plain error by allowing testimony that witnesses believed the complainant's story about sexual assaults). Bolstering a witness's credibility exceeds the proper bounds of aiding the jury to reach conclusions about matters not within its experience. Witness credibility determinations are strictly the domain of the jury. *State v. Olhausen,* 681 N.W.2d 21, 26 (Minn.2004).

Although we conclude that much of Martin's expert testimony was admitted in error, we nevertheless hold that the admission of his testimony was not sufficiently prejudicial to justify a new trial. "Reversal is warranted only when the error substantially influences the jury's decision." *DeShay,* 669 N.W.2d at 888 (quoting *State v. Nunn,* 561 N.W.2d

902, 907 (Minn.1997)). Martin did not testify that Blanche was a member of the Bogus Boyz gang, a factor which caused us concern in *Lopez–Rios.* More importantly, there was no reasonable probability that Martin's testimony about gang behavior substantially influenced the guilty verdict because other witnesses testified that Blanche and members of the Bogus Boyz were hunting down Scott to retaliate for the shooting of Caylon Williams.

Although we are concerned about Martin's testimony that gang members generally do not falsely accuse their own gang members of a crime, we conclude that in this case, based on the testimony of other witnesses and because Martin did not specifically name Robert Williams, this testimony did not substantially influence the verdict. Nevertheless, we reiterate our concern that, especially in criminal cases, district courts should exercise caution in admitting gang-expert testimony because of the potential for such experts to unduly influence the jury. *DeShay,* 669 N.W.2d at 885 (citing *State v. Nystrom,* 596 N.W.2d 256, 259–60 (Minn.1999)). Accordingly, we hold that Blanche is not entitled to a new trial based on improperly admitted gang-expert testimony.

## V.

Next, we consider Blanche's allegations of prosecutorial misconduct. Blanche asserts that the state committed prosecutorial misconduct based on two specific actions.[9] First, Blanche alleges that the prosecutor improperly interjected into closing arguments the prosecutor's personal opinion concerning evidence and witness

---

9. Blanche also argues that the state committed prosecutorial misconduct by improperly eliciting vouching evidence from Lieutenant Martin by asking him whether he had ever experienced gang members falsely accusing people within their own gang of crimes. We

have addressed this issue through our discussion of the admission of gang-expert testimony where we held that the verdict was surely not attributable to Martin's testimony. Therefore, we need not address this issue again here.

credibility. Specifically, the prosecutor prefaced approximately 18 statements in closing argument with phrases such as "I suggest to you," "I think," "I ask you," and "I submit to you." Second, Blanche asserts that the prosecutor improperly suggested that witness Duan Gaines was committing perjury. At trial, Gaines recanted much of the testimony he gave to the grand jury. The prosecutor asked Gaines whether he was aware he was testifying under oath. Gaines responded that he was. The prosecutor then asked Gaines: "You're aware that if you lie about a false material fact—," to which Gaines responded, "It's impeachment." The prosecutor replied, "Well, actually, it would be perjury," and followed up with, "Do you understand that?" Gaines responded that he did.

■■■■■ At trial, Blanche did not object to either instance of alleged misconduct. When a defendant fails to object at trial, he generally forfeits the right to have prosecutorial misconduct considered on appeal. *State v. Sanders,* 598 N.W.2d 650, 656 (Minn.1999). We may, however, review Blanche's argument of prosecutorial misconduct under a plain-error analysis to determine whether "the alleged conduct was so clearly erroneous under applicable law and so prejudicial to the defendant's right to a fair trial that the defendant's right to a remedy should not be forfeited." *State v. Hunt,* 615 N.W.2d 294, 302 (Minn. 2000). When misconduct is present, we will reverse the conviction only if the misconduct impaired the defendant's right to a fair trial. *State v. Powers,* 654 N.W.2d 667, 678 (Minn.2003).

■■■■■ A prosecutor's use of phrases such as "I suggest to you" and "I think" to interject personal opinion into a closing argument is improper. *See Ture v. State,* 681 N.W.2d 9, 20 (Minn.2004). Prosecutors must not interject their personal opin-

ions into a case. This is so in order to prevent "exploitation of the influence of the prosecutor's office." *State v. Everett,* 472 N.W.2d 864, 870 (Minn.1991) (citing ABA Standards Relating to the Prosecutor's Function, 3–5.8(b) and Commentary (1979)). Here, the postconviction court concluded that the prosecutor's use of these phrases was inadvertent and rooted in the prosecutor's rhetorical idiosyncrasies and that "[t]he prosecutor's comments were not such that a jury would view the prosecutor as taking on the role of a witness." We conclude that the language, while poorly chosen, was not, under the facts and circumstances of this case, plain error. *See Everett,* 472 N.W.2d at 870 (holding un-objected-to comments about the defendant's demeanor by prosecutor in closing argument were not in the form of personal opinions and did not constitute plain and prejudicial error). Because a prosecutor's statements may strongly inflame a jury, we again caution the state to avoid *any* language that interjects the prosecutor's personal opinion.

■■■■ With regard to the prosecutor's mention of perjury in questioning Duan Gaines, it appears to us, based on our review of the record, that the prosecutor was attempting to inform Gaines that lying under oath is perjury. After Gaines denied the truth of most of his grand jury testimony, we conclude that the prosecutor did not overstep the proper grounds of impeachment by warning Gaines that lying under oath constitutes perjury. The prosecutor did not directly accuse Gaines of perjury. We conclude that the prosecutor's questioning was not plain error.

For the foregoing reasons, we conclude that the prosecutor's conduct did not deny Blanche a fair trial. Accordingly, we hold that Blanche is not entitled to a new trial on the basis of prosecutorial misconduct.

## VI.

We also address Blanche's claim that his trial counsel was ineffective and therefore he is entitled to a new trial. The state contends that no new and important facts were presented at the postconviction hearing; therefore, Blanche did not meet his burden of proving that his trial counsel was ineffective. We review ineffective assistance of counsel claims de novo because they involve mixed questions of law and fact. *State v. Blom*, 682 N.W.2d 578, 623–24 (Minn.2004).

To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance (1) fell below an objective standard of reasonableness (performance prong), and (2) that a reasonable probability exists that the outcome would have been different but for counsel's errors (prejudice prong). *State v. Rhodes*, 657 N.W.2d 823, 842 (Minn.2003). We need not address both prongs if the defendant fails to demonstrate one of them. *Id.*

To allow counsel "flexibility to represent a client to the fullest extent possible," our review of the performance prong does not include reviewing attacks on counsel's trial strategy. *Opsahl v. State*, 677 N.W.2d 414, 421 (Minn.2004) (quoting *State v. Jones*, 392 N.W.2d 224, 236 (Minn.1986)). Trial strategy includes decisions about what evidence to present to the jury. *State v. Miller*, 666 N.W.2d 703, 716 (Minn.2003). Performance is also not unreasonable when counsel does not object to properly admitted evidence. *See State v. Asfeld*, 662 N.W.2d 534, 546 (Minn. 2003). The prejudice prong of *Strickland* requires that a defendant suffer actual prejudice, which the defendant must prove by a preponderance of the evidence. *Pierson v. State*, 637 N.W.2d 571, 579 (Minn. 2002). When the error is harmless, the defendant cannot satisfy the prejudice prong. *McDonough v. State*, 675 N.W.2d 53, 56–57 n. 4 (Minn.2004).

Blanche argues that Clemons was ineffective because he made objectively unreasonable errors in failing to object to several items of prejudicial evidence and failing to ask for corrective instructions. Blanche contends that his counsel could have had no legitimate strategic considerations for failing to object. We will address each of Blanche's claims of error in turn.

*Bruton Evidence and Midtrial Severance Based on Bruton Violations*

Our conclusion on the *Bruton* issues is controlled by our earlier conclusion that the admitted statements by Bernard were either not admitted in error or were harmless error. We therefore conclude that Clemons' failure to object to the alleged *Bruton* violations was not erroneous because they did not impermissibly prejudice Blanche.

*Robert Williams' letter and Bernard's Counsel's Cross-examination of Detective Zimmer*

Blanche asserts that Clemons' failure to object to the admission of Bernard's letter constituted prejudicial error. But when Clemons cross-examined Zimmer, he attempted to show that Zimmer had directed Williams to write the letter in order to trap Blanche. Clemons' efforts to show that Zimmer conspired with Williams to incriminate Blanche were consistent with Clemons' theme throughout the trial that the state used its power to create the outcome that it wanted and that the state was not concerned about the truth. We have repeatedly said that we will not second-guess counsel's trial tactics. *See, e.g., Opsahl*, 677 N.W.2d at 421. Because Clemons used the letter as a tactic to show that Zimmer was trying to manipulate the outcome of the investigation, we reject

Blanche's claim that Clemons' failure to object to the letter was erroneous.

*Sid Strickland's Testimony That Blanche Had Sold Him "Bags"*

■ Blanche contends that Clemons unreasonably failed to object to Sid Strickland's spontaneous testimony that "[Blanche] sold bags to me and numerous amounts of things." Blanche argues that the comment was unduly prejudicial because Blanche's bad acts of selling drugs are not relevant to the charged crimes. Clemons did not request a curative instruction or move to strike the answer as being nonresponsive to his question. Here, the focus of Clemons' cross-examination of Strickland was to show that Strickland was testifying against Blanche in order to get a reduced sentence. Further, Strickland's comment about "bags" was brief and perhaps ambiguous. Because of the nature and context of the remark, we conclude that Clemons' failure to object to the testimony did not affect the outcome of the trial.

*Limiting Instructions on Expert Testimony on Gangs and Three Gang-related Shootings*

■ A failure to object to jury instructions results in a waiver of the right to appeal absent plain error. *State v. Gutierrez*, 667 N.W.2d 426, 433 (Minn.2003). Blanche claims that Clemons unreasonably failed to ask for a limiting instruction to ensure that the jury did not consider Martin's testimony about gang activities "as proof of [Blanche's] propensity to commit the charged crimes, or that because gang members commit certain crimes [Blanche] likely committed the charged offenses."

Blanche contends that a limiting instruction was required so that the jury would use only Martin's testimony to determine whether the crime had been committed for the benefit of a gang.

■ The court did provide a limiting instruction on expert testimony. Based on our independent review of the record and our previous conclusion that the admission of Martin's testimony was harmless error, and without deciding whether the omission of a more specific instruction was erroneous, we conclude that the omission did not have a significant impact on the verdict in this case. Therefore, Blanche has not shown that Clemons' failure to ask for the limiting instruction caused him prejudice.

■ Blanche also contends that Clemons was prejudicially ineffective when he failed to request a limiting instruction regarding the testimony on the three gang-related shootings. Blanche does not indicate what would have constituted an appropriate limiting instruction, but appears to suggest that the jury should have been instructed that the three gang-related shootings could not be used to show that Blanche had a propensity to commit crime. Character evidence is inadmissible under Minn. R. Evid. 404, but the state did not introduce the three gang-related shootings that preceded Phillips' murder as *Spreigl* evidence.[10] Rather, the state introduced the previous shootings as being directly related to the murder—to establish the reason why Blanche and Bernard had targeted rival gang member Scott and to link Blanche to the murder weapon. Therefore, we conclude that Blanche has failed to prove that Clemons' failure to ask

**10.** "*Spreigl* evidence is evidence of a defendant's prior crimes, wrongs, or acts, which would otherwise be inadmissible, but which the state can seek to have admitted for the limited purpose of showing motive, intent, absence of mistake, identity, or a common scheme or plan." *State v. Asfeld*, 662 N.W.2d 534, 542 (Minn.2003). *See* Minn. R. Evid. 404(b), and *State v. Spreigl*, 272 Minn. 488, 497, 139 N.W.2d 167, 173 (1965).

for a limiting instruction on this issue caused him prejudice.

After reviewing all of Blanche's specific allegations of ineffective assistance of trial counsel, we hold that the postconviction court did not err in concluding that Blanche had failed to establish that Clemons' representation fell below an objective standard of reasonableness and that, but for Clemons' errors, the outcome would have been different.

## VII.

 Finally, we must determine whether the district court erred as a matter of law when it made Blanche's sentence for conspiracy to murder Scott consecutive to his sentence for first-degree murder and when it made these sentences consecutive to Blanche's federal sentence for being a felon in possession of a firearm. We will not reverse a district court's decision to impose a consecutive sentence unless there has been a clear abuse of discretion. *Neal v. State*, 658 N.W.2d 536, 548 (Minn.2003). Generally, we will not interfere with the district court's discretion in sentencing unless the sentence is disproportionate to the offense. *State v. Sanchez–Diaz*, 683 N.W.2d 824, 837 (Minn.2004).[11]

The district court explicitly stated at the sentencing hearing that it was ordering Blanche's sentences to run consecutively. *See* Minn.Stat. § 609.15, subd. 1 (2004). The postconviction court clarified that it was the court's intent to impose consecutive sentences through an upward sentencing departure and to impose the maximum amount of time possible on Blanche. *See* Minn. Sent. Guidelines II.D. Consequently, our analysis of the imposed consecutive sentences falls under our case law discussing departure from the sentencing guidelines and not under Minn. Sent. Guidelines II.F., which provides the circumstances when permissive consecutive sentences may be given without departure. Therefore, we are not going to address whether Blanche's consecutive sentences could have come within the permissive consecutive sentence involving multiple victims under Minn. Sent. Guidelines II.F.2.[12]

 An upward sentencing departure requires "substantial and compelling circumstances in the record." *State v. Griller*, 583 N.W.2d 736, 744 (Minn.1998). Substantial and compelling circumstances are those which demonstrate that the "defendant's conduct was significantly more or less serious than that typically involved in the commission of the crime in question." *State v. Leja*, 684 N.W.2d 442, 450 (Minn.2004) (quoting *State v. Cox*, 343 N.W.2d 641, 643 (Minn.1984)). The rea-

---

**11.** Blanche does not argue that his consecutive sentences implicate the U.S. Supreme Court decision in *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). We nevertheless note Blanche may not avail himself of its holding. While we have yet to determine the parameters of *Blakely*, we have determined that *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), *Blakely's* predecessor, announced a new rule of law. *See O'Meara v. State*, 679 N.W.2d 334, 339 (Minn.2004). Blanche was sentenced on April 12, 1999, and his direct appeal period ended 90 days after the final judgment. Minn. R.Crim. P. 29.03, subd. 3; *see also O'Meara*, 679 N.W.2d at 339

(citing *Griffith v. Kentucky*, 479 U.S. 314, 321 n. 6, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987)). Because Blanche did not file a direct appeal, his conviction became final on July 12, 1999, almost one year before *Apprendi* was decided on June 26, 2000.

**12.** Minn. Sent. Guidelines II.F.2 states:

Except when consecutive sentences are presumptive, consecutive sentences are permissive (may be given without departure) only in the following cases: * * *
2. Multiple current felony convictions for crimes against persons may be sentenced consecutively to each other * * * *.

sons used for departing must not themselves be elements of the underlying crime. *See State v. Thao,* 649 N.W.2d 414, 423–24 (Minn.2002). Additionally, when departing from the presumptive sentence, the district court must provide written reasons which specify the substantial and compelling nature of the circumstances, and which demonstrate why the sentence selected in the departure is more appropriate, reasonable, or equitable than the presumptive sentence. *State v. Foreman,* 680 N.W.2d 536, 540 (Minn.2004); Minn.Stat. § 244.10, subd. 2 (2004); Minn. R.Crim. P. 27.03, subd. 4(C).

The district court stated that it "[had] chosen in its discretion" to run the sentences consecutively because of six aggravating factors, which it clearly identified and stated on the record: (1) the existence of multiple victims, both intended (Scott) and unintended (Phillips); (2) Phillips' vulnerability and complete innocence; (3) the violation of Phillips' zone of privacy; (4) the emotional and psychological devastation to the community from repeated random shootings in residential areas in an effort to assassinate Scott; (5) the harm to the community due to the senseless and brutal killing of a young and innocent child; and (6) Blanche's apparent lack of remorse and responsibility.[13] None of these factors are elements of the underlying crimes.

We are also concerned that the sentence not exaggerate the criminality of the defendant's conduct. *State v. Hough,* 585 N.W.2d 393, 398 (Minn.1998). To determine whether the consecutive sentences unfairly exaggerate Blanche's criminality, we compare his sentence with sentences imposed on other similarly-situated offenders. *See Neal,* 658 N.W.2d at 548. In *State v. Back,* we upheld an upward durational departure from the presumptive sentence when repeated random shootings in a neighborhood involved a high risk of bodily harm, the victim was killed on her front porch, and the victim was randomly chosen. 341 N.W.2d 273, 276–78 (Minn. 1983). We said that "[invading] the victim's curtilage" was an aggravating factor. *Id.* at 277; *see also Hough,* 585 N.W.2d at 397 (stating that upward departures are appropriate where a defendant invades the zone of privacy that surrounds the victim's home).

We conclude that the district court did not abuse its discretion in imposing consecutive sentences under the circumstances of this case and that the reasons provided for departure were not part of the underlying offenses. In the attempt to hunt down and assassinate a rival gang member, ten bullets were indiscriminately fired in a residential area. Phillips, an 11-year–old child who was particularly vulnerable, was shot to death while playing with his cousin and a friend on the friend's front porch, a place where Phillips should have felt safe. We conclude that the spray of bullets that damaged neighborhood property and killed the unintended victim, Phillips, shows a degree of recklessness that justifies departure. The imposition of consecutive sentences does not exaggerate Blanche's criminality.

For the same reasons, we conclude that the district court did not err in making Blanche's state sentences consecutive to his federal sentence. *See State v. Gassler,* 505 N.W.2d 62, 69 (Minn.1993) (allowing state sentence to run consecutively to fed-

---

**13.** We note that a defendant's remorse usually bears only on a decision whether or not to depart dispositionally, not on a decision to depart durationally or with respect to consecutive sentences. *Back,* 341 N.W.2d at 275. Because this is only one of six aggravating factors, however, our conclusion is not impacted in this case.

eral sentence so long as sentence does not exaggerate criminality of conduct).

Based on all of the foregoing, we hold that Blanche is not entitled to a new trial. Having so concluded, we do not consider the state's alternative argument that a new trial would be unduly prejudicial to the state.

Affirmed.

ANDERSON, G. BARRY, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.