STATE of Minnesota, Respondent,

v.

De–Aunteze Lavion BOBO, Appellant.

and

De–Aunteze Lavion Bobo,
petitioner, Appellant

v.

State of Minnesota, Respondent.

Nos. A07–1688, A08–1201.

Supreme Court of Minnesota.

July 30, 2009.

Lawrence Hammerling, Chief Appellate Public Defender, Bridget Kearns Sabo, Assistant Public Defender, St. Paul, MN, for appellant.

Lori Swanson, Attorney General, St. Paul, Minnesota; and Michael O. Freeman, Hennepin County Attorney, Donna J. Wolfson, Assistant County Attorney, Minneapolis, MN, for respondent.

## OPINION

ANDERSON, G. BARRY, Justice.

Appellant De–Aunteze Lavion Bobo was found guilty of first-degree murder while committing a drive-by shooting, second-degree intentional murder, second-degree murder while committing a drive-by shooting, and drive-by shooting in connection with the shooting death of James Roberts and injuries sustained by Reginald Nichols. Bobo appealed his conviction, but his direct appeal was stayed pending his petition for postconviction relief. His direct appeal was combined with his appeal of the denial of his petition for postconviction relief. We affirm.

James Roberts and Reginald Nichols were together late June 1, 2006, into the morning hours of June 2, 2006. The two men were at a bar, Stand Up Frank's ("Frank's"), to visit a friend employed at Frank's. Frank's, which is on the corner of 2nd Street North and 21st Avenue North in Minneapolis, was closed when they arrived, so they parked outside the bar, talked, and drank beer while waiting for their friend.

Roberts was sitting in the driver's seat of a Hyundai Elantra and Nichols was in the front passenger seat. The friend came out of Frank's and talked to them at their car for 10 to 15 minutes, but then returned to the bar to finish closing up.

Approximately 20 to 30 minutes after Nichols and Roberts arrived at Frank's, and after the friend had gone back into the bar, a dark-colored truck or SUV drove past them. Nichols thought the vehicle looked like a Yukon or a Tahoe; he was not able to discern the exact model or color of the vehicle because there was little light. He remembered that the vehicle had four doors, dark tinted windows, and fancy "star" rims on the wheels. He also thought the vehicle had dual rear doors that opened outward instead of upward. Nichols testified that the windshield of the vehicle was intact and that the side windows were not broken; Nichols did not observe any cracks in the glass or plastic on any windows. Nichols could not see anyone inside the vehicle.

The vehicle initially went past Roberts and Nichols' car, but then made a U-turn at the corner and came back. As the vehicle proceeded past their car for the second time, someone in the vehicle began firing shots at Roberts and Nichols. Nichols testified that the shots, as many as 20, came from the driver's side of the vehicle.

Nichols suffered gunshot wounds to his back, arms, and groin, but testified at trial that he suffered no long-term effects from his injuries.

The shots Roberts sustained killed him almost instantaneously. Roberts was found seated upright in the Elantra, which was surrounded by spent shell casings and bullet fragments. Andrew Baker, a Hennepin County medical examiner, testified that Roberts was shot seven times in the upper body, and that he would not have survived the shots to his chest even if he had received immediate medical attention.

A witness who lived in the neighborhood was out on the balcony of his apartment in the early morning hours of June 2, 2006. He observed a dark-colored SUV stop next to a white car parked across from Frank's and then heard gunshots. He testified that the SUV quickly went past him and made a left turn onto Washington Avenue. Because it was dark and events happened so fast, he was not able to get the license plate number of the SUV. He also did not note the make or model of the SUV or note any other specific details about the vehicle.

Because Nichols and the witness could provide only limited identifying information about those involved in the shooting and the crime scene revealed no forensic clues, the investigation of the murder was stalled. On June 12, 2006, Minneapolis police executed an unrelated warrant in St. Louis Park, and arrested Leonard Slaughter at a St. Louis Park apartment on unrelated charges. During the course of Slaughter's arrest, a 9 millimeter Ruger handgun was discovered between the mattress and box spring in the bedroom where Slaughter was found. At some point in 2006, police compared the gun with the cartridge casings and bullet fragments recovered from the area in and around Nichols' car. Forensic scientist Kris Reynolds testified that, in her expert opinion, the cartridge casings and bullet fragments found at the murder scene came from the 9 millimeter Ruger handgun.

Bruce Folkens, the lead investigator into Roberts' killing, testified that by late August 2006, he was aware that the 9 millimeter Ruger handgun was likely the murder weapon. Folkens interviewed Slaughter while he was in custody on other charges, but Folkens could not remember exactly what Slaughter said during that interview. Folkens did recall that Slaughter did not confess to the murder. Due to the circumstances associated with identification of the murder weapon, the police were also looking at Slaughter's known associates, including his cousin De-Aunteze Bobo.

At the end of August 2006, Folkens got a call from a police officer telling him that Sam James, who was in custody in Hennepin County, claimed to have information on Roberts' murder. James was in custody after pleading guilty to aggravated robbery on August 10, 2006. Folkens met with James on September 1, 2006, and James provided him with details about the gun Slaughter carried and the types of vehicles Bobo drove. Folkens verified these details as correct. James, at the instigation of the police and by order of the district court, was released from custody without bail so that he could work with Folkens as an informant. No specific promises were made to James in exchange for information, but the possibility of no additional jail time was discussed.

But the information provided by James was not always accurate. James eventually confessed to an unrelated murder after first identifying someone else as the culprit.

James did, however, give statements both to the police and to the grand jury that not only implicated Bobo in Roberts'

murder, but also included details that were corroborated by other evidence: (1) cell phone records from Bobo and Slaughter's phones showed calls that triggered some of the same towers and placed them both in the general vicinity of Frank's around the time of the murder; (2) Bobo had access to two vehicles that were similar to the description of the vehicle given by the witnesses of the shooting; and (3) the murder weapon was found in the same room as Slaughter, who is Bobo's cousin and friend. In his grand jury testimony, James provided significant details about the murder, stating that Bobo told Slaughter to get the gun out of the stash box and to shoot Roberts and Nichols when they passed by Roberts and Nichols the second time. James said Bobo and Slaughter thought they recognized Roberts as a man they had "got[ten] into it with" and "had words" with at some point.[1]

The district court issued a subpoena ordering James' attendance at Bobo's trial. But James refused to testify and was uncooperative. He took the stand, stated that Bobo was innocent, and refused to answer any other questions. The court excused the jury and allowed the State to treat James as a hostile witness, but he persisted in his refusal to testify. The court finally held James in contempt and advised him that the contempt order could be purged if he later agreed to testify.

The State argued that James refused to testify because Bobo had intimidated him and moved to admit James' prior statements to the grand jury and the police because Bobo, by virtue of intimidating James, had forfeited his right to cross-examine James. The State presented evidence, in a hearing outside the presence of the jury, that both James and Bobo were members of the Rolling 30's Bloods gang and that, on the date James was scheduled to testify, gang members were present at the trial. The State also presented evidence regarding letters arguably intended to influence James not to testify, as well as double hearsay regarding alleged conversations in which Bobo's friends or relatives encouraged James not to testify. According to Folkens, who spoke to James after James refused to testify, James decided not to testify after facing Bobo directly and seeing all of the other people in the courtroom.

Bobo testified for the purposes of the State's motion that he had not had any communication with James since his arrest and that Bobo did not threaten James or arrange for anyone else to threaten James. The district court considered all the evidence and concluded that the State had not met its burden to show that Bobo intimidated James and refused to admit James' prior statements on this basis.

In response to this ruling, the State requested that James return to the stand and that the district court close the courtroom to spectators during his testimony. Bobo argued that the closure was not necessary and that Bobo's family was entitled to attend the trial. The court barred the public from the courtroom during James' testimony. When James took the stand for the second time, he was again unwilling to testify and he refused to answer any of the State's questions. The State again moved to admit James' prior grand jury testimony, this time citing Minn. R. Evid. 801(d)(1)(A).[2] Bobo opposed this motion,

---

1. Nichols testified that Roberts never told him about any fight, and Nichols believed Roberts would have told Nichols about a fight.

2. Minnesota Rule of Evidence 801(d)(1)(A) provides: "A statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . inconsis-

arguing that James was not available for cross-examination. The State responded that Bobo could not claim James was unavailable for cross-examination when Bobo made no attempt to cross-examine James. The district court concluded that only a part of the grand jury testimony was admissible. The admitted evidence included statements that James knew Slaughter and that James had previously testified under oath in the grand jury proceedings, both factual statements James had denied on the stand.[3] But the district court refused to admit the portions of James' testimony that incriminated Bobo.

After that decision, the State called James to the stand for a third time. James once again refused to testify. This time Bobo's counsel cross-examined James. On cross-examination, James testified that he did not tell the truth to the grand jury and that the police wanted him to implicate Bobo. James said that the information he gave police regarding Bobo came from his personal relationship with Bobo and from the police. James testified that Bobo never claimed any involvement in the shooting at Frank's and that James only said otherwise to make a deal with the police. Because the testimony James gave on cross-examination contradicted his earlier sworn testimony to the grand jury, the district court granted the State's motion to admit essentially all of James' grand jury testimony as a prior inconsistent statement under Minn. R. Evid. 801(d)(1)(A).

Before and after reading James' grand jury testimony to the jury, the State provided its corroborating evidence, including the cell phone records, descriptions of vehicles Bobo had access to, and testimony about where the police found the murder weapon. Folkens testified that Bobo's mother drove a blue-green, two-door Chevy K–15 SUV. Folkens saw this vehicle and described it as a two-door full-size SUV, with a rear door that opened upward and standard wheels. Bobo's mother, Nikoe Lee, confirmed that she owned the Chevy K–15 and generally confirmed Folkens' description of the vehicle. Lee added that the rear passenger window of the K–15 was broken in late May and was not repaired until June 20, 2006. Lee stated that Bobo occasionally drove the K–15, and Richfield police officer William Stanger testified that Bobo was driving the K–15 on May 26, 2006, when Stanger stopped Bobo for a traffic violation. Folkens also testified, and Lee confirmed, that Lee was the registered owner of a black Chevy S–10 Blazer. Folkens said Bobo was driving the S–10 on June 2, 2006, when he was stopped by a state patrol officer for an undisclosed reason at 3:20 a.m. The vehicle was impounded and later destroyed because it was unclaimed. Folkens did not see the S–10 before it was destroyed, but Lee described it as a black, two-door vehicle with a rear door that opened upward. She said the windows were not tinted and the wheels were old and not at all fancy. Lee also said that neither the K–15 nor the S–10 had "stash boxes" or anything other than regular consoles.

Bobo did not testify at trial. He presented an alternative perpetrator theory and argued that the State did not meet its burden of proof. The defense presented evidence that a Michael Smith had been investigated by the police as a suspect in Roberts' murder. Smith and Roberts' son had a girlfriend in common and, on at least

---

tent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding . . . ."

**3.** Although James repeatedly stated that Bobo was "innocent" while on the stand, the district court concluded these statements were not testimonial.

one occasion, had fought regarding the girlfriend.

Folkens, in the course of the investigation, questioned Smith about his whereabouts on the night of the murder and Smith said that he had been at Frank's on June 1, 2006. Smith said he went to a party approximately a mile from Frank's after he left the bar. The court admitted Smith's cell phone records, which showed that during the time he claimed to have been at the party, he triggered two different cell towers.[4] One was on Plymouth Avenue near the party he said he attended; one was in downtown Minneapolis. Folkens did not pursue Smith as a suspect largely because the internal police reporting system indicated that he and Slaughter did not associate together. Folkens did not recall ever asking Smith if he knew Slaughter; he believed they did not associate with the same people.

Bobo was found guilty of first-degree murder while committing a drive-by shooting, second-degree intentional murder, second-degree murder while committing a drive-by shooting, and drive-by shooting. The district court adjudicated Bobo guilty on the first-degree murder conviction and imposed a life sentence. The district court also imposed a separate, concurrent 98–month sentence for the drive-by shooting conviction. Bobo appealed his convictions. That appeal was stayed pending his petition for postconviction relief.

Bobo petitioned the postconviction court for relief, alleging ineffective assistance of counsel and juror misconduct. The postconviction court denied the petition. Bobo now appeals the postconviction court's determination that he received effective assistance of counsel[5] but does not appeal the postconviction court's determination on the alleged juror misconduct. He also argues on direct appeal that he was deprived of his right to a public trial, that the prosecutor committed misconduct, and that he was denied his rights under the Confrontation Clause.

I.

 Bobo first argues that he was denied effective assistance of counsel. We review a postconviction court's decisions of law de novo, but review of questions of fact is limited to whether there is sufficient evidence to support the postconviction court's findings. *Sanchez–Diaz v. State,* 758 N.W.2d 843, 846 (Minn.2008). A defendant has the right to effective assistance of counsel. *See Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). We use a two-pronged analysis, focusing on whether "counsel's performance fell below an objective standard of reasonableness" and whether "a reasonable probability exists that the outcome would have been different but for counsel's errors," for determining whether a defendant should be granted a new trial because of his counsel's alleged ineffective assistance. *State v. Rhodes,* 657 N.W.2d 823, 842 (Minn.2003) (quoting *State v. Lahue,* 585 N.W.2d 785, 789 (Minn.1998)).

---

**4.** There was extensive testimony at trial about why a cell phone triggers certain cell towers. Essentially, a cell phone will usually trigger the closest tower, but will trigger a different tower if that tower has a stronger signal. The strength of the signal can vary depending on the number of users, geography (including tall buildings) and the caller's exact location. There was no testimony that a cell phone's location can be pinpointed based on which cell tower was triggered.

**5.** On March 23, 2009, two weeks after oral argument in our court, Bobo filed a motion asking that we accept a second pro se supplemental brief. This motion was denied as untimely. *See* Minn. R.Crim. P. 29.01, subd. 2; Minn. Civ.App. P. 131.01.

■ Under the first prong, a defendant must show that counsel's performance was deficient, which means that counsel's performance " 'fell below an objective standard of reasonableness.' " *Gates v. State*, 398 N.W.2d 558, 561 (Minn.1987) (quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052). Counsel acts within that objective standard of reasonableness when the attorney provides the client with the "representation by an attorney exercising the customary skills and diligence that a reasonably competent attorney would perform under similar circumstances." *State v. Gassler*, 505 N.W.2d 62, 70 (Minn.1993) (citation omitted) (internal quotation marks omitted). What evidence to present to the jury, what witnesses to call, and whether to object are part of an attorney's trial strategy which lie within the proper discretion of trial counsel and will generally not be reviewed later for competence. *Boitnott v. State*, 631 N.W.2d 362, 370 (Minn.2001); *State v. Jones*, 392 N.W.2d 224, 236 (Minn.1986). Under the prejudice prong, a defendant must show that his counsel's errors so prejudiced the defendant at trial that a different outcome would have resulted but for the error. *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052.

■ Bobo argues that the failure of his counsel to object to the State calling Sam James to the stand three times was unreasonable error and that the State's multiple efforts violated principles outlined in *State v. Dexter*, 269 N.W.2d 721 (Minn.1978). Bobo acknowledges that *Dexter* dealt with the State calling a witness it knew would testify inconsistently with a prior statement solely for purposes of impeaching the witness with otherwise inadmissible statements, while here the State sought to admit the prior inconsistent statement as substantive evidence, but argues that the State was violating the spirit of *Dexter* and defense counsel therefore should have objected. The State argues that while defense counsel could have relied on *Dexter*, we have held that *Dexter* does not apply in situations where the prior statement was admissible as substantive evidence. *See State v. Ortlepp*, 363 N.W.2d 39, 43–44 (Minn.1985).

We have previously held that an ineffective counsel claim based on a failure to make a *Dexter* objection, where the inconsistent statement was admitted *substantively* rather than for impeachment purposes, has no merit. *Ortlepp*, 363 N.W.2d at 46. The situation here is not exactly analogous to *Ortlepp*, because in that case the witness testified inconsistently, while here the witness refused to testify. But defense counsel could have reasonably believed that *Dexter* would no more apply here than it did in *Ortlepp* because here the statement was admitted substantively, as it was in *Ortlepp*. Therefore, a failure to make that objection does not fall below an objective standard of reasonableness. While defense counsel signed an affidavit stating it had not occurred to him to object to James being repeatedly called to the witness stand, on the record before us, we believe Bobo's counsel's failure to object was trial strategy, which we do not review. Even if it were not trial strategy, failing to make an objection that would not succeed is not professionally unreasonable, *see Ortlepp*, 363 N.W.2d at 46, and Bobo therefore fails to meet the first prong of the *Strickland* test for ineffective assistance of counsel.

Bobo next argues that defense counsel was professionally unreasonable in deciding to cross-examine James. He argues that it was this cross-examination that allowed the grand jury testimony of James to be admitted into evidence.

■ But we conclude that the district court erred in refusing to admit the grand jury testimony as an inconsistent prior

statement after James' first time on the stand. James' grand jury testimony, even before the cross-examination, should have been admitted under Minn. R. Evid. 801(d)(1)(A) as a prior inconsistent statement. While on the stand, under oath, James stated multiple times that Bobo was innocent. While this was not in response to any particular question, we have previously treated spontaneous witness statements as testimony. *See State v. Blanche,* 696 N.W.2d 351, 377 (Minn.2005); *State v. Washington,* 693 N.W.2d 195, 204–05 (Minn.2005). Thus, James' statements at trial that Bobo was innocent were inconsistent with the bulk of his grand jury testimony that detailed how Bobo helped Slaughter commit the drive-by shooting and his grand jury testimony should have been admitted before Bobo's counsel cross-examined James. Therefore, this cross-examination was not professionally unreasonable.

Furthermore, although defense counsel claimed in his affidavit to the postconviction court that he believed, under *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), he was required to cross-examine Bobo, the postconviction court did not find his affidavit credible and neither do we. We conclude that defense counsel made a strategic decision about what evidence to present at trial by eliciting what positive testimony he could from James on cross-examination and then, when the grand jury testimony was admitted, argued to the jury that either (1) they should believe James was telling the truth at trial or (2) James was so inherently unreliable that his testimony did not prove anything beyond a reasonable doubt. This is trial strategy and not subject to review. *See Jones,* 392 N.W.2d at 236.

## II.

■ Bobo argues that the district court erred in closing the courtroom to the public the second time James was called to the witness stand. Bobo claims that there was no reason for the district court to believe that James was intimidated by the spectators in the courtroom, as the district court had just found that Bobo had not forfeited his confrontation right by intimidating James. Bobo further argues that because the district court's decision to close the courtroom was unsupported by the evidence, it constituted a structural error requiring automatic reversal. The State argues that there was evidence to support the closure of the courtroom.

■ Questions of constitutional law are reviewed de novo. *State v. Mahkuk,* 736 N.W.2d 675, 684 (Minn.2007). The right to a public trial is guaranteed by the United States and Minnesota Constitutions. U.S. Const. amend. VI; Minn. Const. art. I, § 6. But the right to a public trial is not absolute and may "give way in certain cases to other rights or interests." *Waller v. Georgia,* 467 U.S. 39, 45, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984). To close proceedings a party must:

> advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

*Id.* at 48, 104 S.Ct. 2210. The unconstitutional denial of a defendant's right to a public trial is considered a structural error that is not subject to a harmless error analysis. *Id.* at 49, 104 S.Ct. 2210; *State v. McRae,* 494 N.W.2d 252, 259–60 (Minn. 1992). However, the remedy for such a violation should be appropriate to the violation, and a retrial is not required if a remand will remedy the violation. *McRae* 494 N.W.2d at 260.

### A. Overriding interest

 Bobo argues that the State's "overriding interest" in protecting James from intimidation and thus encouraging him to testify was not adequate in light of the evidentiary hearing the district court previously conducted on James' intimidation. Bobo argues that the State bore the burden of establishing the existence of a "substantial probability of prejudice," *United States v. Doe*, 63 F.3d 121, 128 (2d Cir.1995), and that the State presented its "best evidence of intimidation it could muster, but still failed to show that anyone deliberately intimidated James."

Bobo mischaracterizes the district court's findings. The district court did not find that *no one* deliberately intimidated James, it found that *Bobo* did not deliberately intimidate James. This difference is especially relevant because *Bobo* was not excluded from the courtroom; the public, which included many alleged gang members, was excluded. Therefore, while the district court's findings are not irrelevant, neither are they conclusive on this issue. Furthermore, even if *no one* deliberately intimidated James, this does not mean that James was not intimidated. *See, e.g., People v. Hok Ming Chan*, 230 A.D.2d 165, 173, 656 N.Y.S.2d 22 (1997), *aff'd, People v. Ming Li*, 91 N.Y.2d 913, 669 N.Y.S.2d 527, 692 N.E.2d 558, 559 (1998) ("Irrespective of whether these perceived threats could be tied to the men outside the courtroom, [the defendant]'s belief that the connection existed and his acute emotional reaction upon seeing the group of Chinese men outside the courtroom justified closure.").

Bobo argues that, as in *Mahkuk*, 736 N.W.2d at 685, the State simply offered generalized gang expert testimony that did not justify closing the courtroom to the public. The record does not support this argument. In the evidentiary hearing considering whether Bobo forfeited the right to confront James, Officer Seidel testified that he identified several gang members who entered the courtroom immediately before the first time James took the witness stand and then left immediately after his testimony. Furthermore, Officer Folkens specifically testified that James claimed the reason he did not testify was because he was afraid after seeing Bobo and all the other people in the courtroom. Thus, unlike *Mahkuk*, there *was* evidence from a witness asserting that James had been intimidated or threatened.

Thus, we conclude that there was sufficient evidence to support the district court's finding that keeping the courtroom open was substantially likely to jeopardize the overriding interest that James testify truthfully at trial.

### B. Breadth of closure

 Bobo argues that the complete closure of the courtroom to the public was not narrowly tailored because the district court should have limited the access to specific people rather than the general public. When the district court is justified in closing the courtroom, the closure must be no broader than necessary to protect that overriding interest. *Waller*, 467 U.S. at 45, 104 S.Ct. 2210. In this case, the district court chose to close the courtroom only for James' testimony. The district court considered excluding specific individuals but rejected the option as not feasible.

### C. Reasonable alternatives

 Bobo argues that the district court did not properly consider other alternatives, but he fails to advance what those alternatives would have been, resting instead on his argument that no one intimidated James and that was why the district court had difficulty crafting other alternatives. The district court must consider all reasonable alternatives to closure. *Waller*,

467 U.S. at 45, 104 S.Ct. 2210. Here the district court considered attempting to exclude only those who might intimidate James, but ultimately discarded that option as untenable. The district court rejected having someone standing at the door to the courtroom, attempting to identify those who were Rolling 30's Bloods gang members or who might otherwise intimidate James, as ineffective and potentially an invasion of privacy. Here, the district court appropriately considered reasonable alternatives and found the temporary closing of the courtroom to the public during James' testimony to be the only reasonable alternative.

### D. Adequate findings

 Bobo argues that the district court did not make adequate findings regarding James' intimidation. He claims that if the district court had done so, it would have been better equipped to limit the closure to specific people, rather than the general public. When a district court determines that closing the courtroom in any manner is necessary, it must make adequate findings. *Waller*, 467 U.S. at 45, 104 S.Ct. 2210. While the district court did not make extensive findings at the time of its ruling, it did put more findings on the record later in the trial. The district court found that the prior presence of gang members might communicate "an implicit threat that [James] was in danger if he testified in a way unfavorable to a fellow gang member." This finding was based on the district court's observations of the spectators and the evidence presented at the earlier hearing. The court made findings about the breadth of the closure, noting that the restriction was limited to James' testimony and the trial was not otherwise closed. The court further explained that it had considered the alternative of closing the courtroom only to those who would instill fear in James, but rejected it as untenable. The court was concerned that such a closure would be inconvenient, insulting, and an invasion of privacy.

On this record, we conclude that the district court made adequate findings supporting the decision to close the courtroom, the breadth of that closure, and the absence of reasonable alternatives to closure. Therefore, Bobo's right to a public trial was not violated.

### III.

 Bobo argues that the prosecutor committed prosecutorial misconduct by claiming that James' testimony at trial varied from his grand jury testimony because he was intimidated. There was no objection by Bobo to the prosecutor's statements at trial. Generally, if a defendant does not object at trial, the claim is waived on appeal. *State v. Ramey*, 721 N.W.2d 294, 297 (Minn.2006). Unobjected-to error can be reviewed only if it constitutes plain error. *Id.* Thus, we apply a plain error standard of review to Bobo's claims. *Id.* First, Bobo must demonstrate (1) error (2) that is plain. *Id.* at 298. If Bobo proves plain error, then, in the context of prosecutorial misconduct, the burden shifts to the State to show that the defendant's substantial rights were not affected, meaning that there is no reasonable likelihood that the absence of the unobjected-to remarks would have significantly affected the jury's verdict. *State v. Davis*, 735 N.W.2d 674, 681–82 (Minn.2007). If there is plain error that affects a defendant's substantial rights, we assess "whether the error should be addressed to ensure fairness and the integrity of the judicial proceedings." *Ramey*, 721 N.W.2d at 302.

During the closing argument, the prosecutor addressed the "two Sam James in front of" the jury. According to the prose-

cutor, the first Sam James was the man at trial who refused to answer questions and laughed at inappropriate times, and the second Sam James was the man who cooperated with the police and testified against Bobo at the grand jury. In an effort to persuade the jury to believe the Sam James who testified to the grand jury, the prosecutor explained that there were certain pressures at the trial, including intimidation. Bobo especially objects to the prosecutor's following argument:

> You can also consider the intimidation that you may have seen in the courtroom. At that the [sic] time, 1:30ish on Tuesday, if you looked back into the gallery of the courtroom, what you saw was a sea of people, people who had never been here at any other time in the trial and haven't been here since. They were here for the express purpose of Sam James' testimony. They filed in before his testimony, they filed out after he refused to testify. Those people were here to intimidate Sam James. And it worked. Sam James refused completely to testify on Tuesday. And you can rely on your own memory of what you saw in the courtroom that acted upon him, those forces that were acting upon him on that day last Tuesday.

Bobo claims the prosecution did not present any evidence to the jury to support the argument that the spectators in the courtroom intended to intimidate James or that James was intimidated. Bobo argues that these statements in the final argument were intended to inflame the jury because the prosecution knew that many of the jurors were worried about "the level of activity" in the courtroom during James' testimony.

The State argues that there was evidence of James' fear and intimidation presented to the jury. In testimony from the grand jury proceeding, testimony that was ultimately read to the jury, James admitted to being afraid of Bobo and Slaughter "in a way." Sergeant Folkens testified at trial that James had told him, the day before James was scheduled to testify, that James was scared to testify. Folkens also testified about how many spectators James recognized in the courtroom the first time he took the stand.

Prosecutors may not make arguments that are not supported by evidence or that are designed to inflame the passions and prejudices of the jury. *State v. Mayhorn*, 720 N.W.2d 776, 786–89 (Minn.2006). During closing argument, a prosecutor " 'may argue all reasonable inferences from evidence in the record. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.' " *State v. Salitros*, 499 N.W.2d 815, 820 (Minn.1993) (quoting I *ABA Standards for Criminal Justice, Special Functions of the Trial Judge Standard* 3–5.8 (2d ed. 1979)). Here, because there was *some* evidence admitted documenting intimidation of James, the argument that James refused to testify because he was intimidated is a reasonable inference from that evidence. Furthermore, while it is possible the argument was inflammatory, the prosecutor did have to deal with the issue of James' credibility. The prosecutor sought to explain why James generally refused to answer the prosecutor's questions and instead claimed that Bobo was innocent and that James had lied to the grand jury about Bobo's innocence. We conclude, on this record, that there was no error in the prosecutor's argument concerning the inconsistencies in the testimony by James.

But even if there was an error, it did not affect Bobo's substantial rights. Bobo was not convicted of first-degree pre-

meditated murder, the most serious charged crime, undercutting the alleged inflammatory effect of the argument. Furthermore, the unobjected-to portion of the closing statement was brief in comparison to the rest of the closing argument and the comments on intimidation were not pervasive.

Defense counsel was also given the opportunity to rebut the prosecution's argument that intimidation was the reason for the change in James' testimony. The district court also instructed the jury that the arguments of counsel were not evidence. On this record, there is no reasonable likelihood that the absence of the unobjected-to remarks would have significantly affected the jury's verdict. Therefore, we hold that Bobo was not denied a fair trial by prosecutorial misconduct.

### IV.

■ Bobo argues that allowing Dr. Baker, a Hennepin County Medical Examiner, to testify about an autopsy he did not perform violated Bobo's confrontation right under *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The State argues that the autopsy report was not testimonial and that the coroner was permitted to rely on it under Minn. R. Evid. 703(a).

Because Bobo did not object to Dr. Baker's testimony, our review is for plain error. *See Ramey,* 721 N.W.2d at 302.

Roberts' autopsy was performed by Dr. Kathryn Berg. At the time of Bobo's trial she was apparently no longer with the Hennepin County Medical Examiner's Office. Dr. Andrew Baker testified about the autopsy results, relying on the report that Dr. Berg prepared. Dr. Baker testified that the cause of death was "multiple gunshot wounds" and the manner of death was "homicide" which, to the doctor, meant Roberts "was killed by another person or another persons."

Bobo did not object to Dr. Baker's testimony at trial; he also did not object to the admission of the autopsy photographs or bullet evidence envelopes admitted through Dr. Baker. Defense counsel conducted no cross-examination of Dr. Baker. At no time during the trial did Bobo dispute the manner in which Roberts died; rather he disputed that Bobo was one of the perpetrators.

The United States Supreme Court, in *Crawford v. Washington,* held that statements from witnesses who do not testify at trial are not admissible unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant if the statements are "testimonial." 541 U.S. at 59, 124 S.Ct. 1354. We have not previously considered whether an autopsy report is testimonial and do not do so today. Regardless of whether an autopsy report is testimonial, the district court's admission of it was not plain error, nor did it affect Bobo's substantial rights.

■ "An error is 'plain' if it is clear and obvious." *State v. Jones,* 753 N.W.2d 677, 686 (Minn.2008). Although a court of appeals decision has held that admitting an autopsy report, prepared by a coroner who was not testifying, into evidence was plain error, this decision was released after Bobo's trial and was not available to the district court. *See State v. Johnson,* 756 N.W.2d 883 (Minn.App.2008), *rev. denied* (Minn. Dec. 23, 2008). Further, the greater weight of authority from other jurisdictions holds that autopsy reports are not testimonial. *See United States v. Feliz,* 467 F.3d 227, 237 (2d Cir.2006) (holding that autopsy reports are business records and therefore not testimonial under *Crawford* ); *United States v. De La Cruz,* 514 F.3d 121, 133 (1st Cir.2008) (holding that autopsy report on cause of drug user's

death, used to support sentence enhancement, was not "testimonial" but rather a business record); *cf. Rollins v. State,* 392 Md. 455, 897 A.2d 821, 839, 845–46 (2006) (holding that autopsy reports are not "per se testimonial" but may be testimonial if they contain "contested opinions or conclusions or are central to the determination of the defendant's guilt"). While we do not reach the issue of whether autopsy records are testimonial under *Crawford,* the absence of relevant Minnesota precedent at the time of Bobo's trial combined with the authority from other jurisdictions rejecting the *Crawford* argument, makes it clear that the error, if any, in admitting the autopsy testimony cannot in anyway be characterized as plain.

■ Furthermore, permitting Dr. Baker to testify did not affect Bobo's substantial rights. Bobo now claims that the reason he did not cross-examine Dr. Baker at trial was because he "could not effectively rebut the autopsy report or Baker's testimony." But it is more likely that the reason for not cross-examining Dr. Baker is because Bobo never disputed that manner in which Roberts died. Bobo's two principal defenses at trial were that someone else committed the drive-by shooting and that the State did not present enough evidence to convict him. Neither theory depends on rebutting the autopsy report or Dr. Baker's testimony. Indeed, nothing in Dr. Baker's testimony linked Bobo to the crime in any way; rather it was necessary to demonstrate that Roberts was dead and that a homicide had occurred, facts not disputed by anyone at trial. Bobo's *Crawford* argument with respect to the autopsy testimony fails.

## V.

Bobo makes numerous claims in his pro se brief. He first claims that his counsel was ineffective because he failed to object to the indictment when the State's key witness "admitted" that he gave perjured testimony to the grand jury. As support, Bobo references affidavits that James signed stating he was not the informer. But these affidavits do not state that James lied to the grand jury. They do state that James was not the police informer, a fact clearly rebutted by James' grand jury testimony. It is true that James testified at trial that he had lied to the grand jury. It was not professionally unreasonable, however, for defense counsel not to object to the indictment where he could, and did, argue that James was more credible at trial, or so lacked credibility that a conviction should not be based on his grand jury testimony. Furthermore, James denied what he told the grand jury for the first time at trial, which was long past the time an effective objection to the indictment could be made.

Bobo also claims prosecutorial misconduct occurred when the State presented perjured testimony. This perjured testimony is the same as discussed above and this claim fails for similar reasons. First, it is not clear when James was lying, at trial or to the grand jury. If James was lying to the grand jury, the prosecutor did not know of James' claim that it was a lie until after the trial had began. Furthermore, as evidenced by the prosecutor's actions, the prosecutor did not appear to believe that the grand jury testimony was perjured but rather that James was intimidated into not testifying at trial.

Bobo claims, finally, that had the perjured testimony not been presented to the grand jury the evidence would not have been sufficient to indict him. But Bobo provides no evidence that James' grand jury testimony, as opposed to his testimony at trial, was perjured. The grand jury had an opportunity to observe and question James and found his grand jury testi-

mony to be credible. Bobo's pro se claims are without merit.

Affirmed.