*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A23-0597**

State of Minnesota,
Respondent,

vs.

Marcus Allen Reynolds,
Appellant.

**Filed April 29, 2024**
**Affirmed**
**Ede, Judge**

Hennepin County District Court
File No. 27-CR-22-21003

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Mary F. Moriarty, Hennepin County Attorney, Linda M. Freyer, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Jenna Yauch-Erickson, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Larson, Presiding Judge; Reyes, Judge; and Ede, Judge.

**NONPRECEDENTIAL OPINION**

**EDE**, Judge

In this direct appeal from a final judgment of conviction for possession of a firearm by an ineligible person, appellant argues that the prosecutor committed prejudicial misconduct by misstating his testimony and the defense's learned-treatise evidence during closing argument. Because we conclude that the prosecutor's misconduct did not

substantially influence the jury to convict appellant and that the jury's verdict was surely unattributable to the misconduct, we affirm.

## FACTS

Respondent State of Minnesota charged appellant Marcus Allen Reynolds with possession of a firearm by an ineligible person, in violation of Minnesota Statutes section 624.713, subdivision 1(2) (2022). The matter proceeded to a three-day jury trial. The following summary of relevant evidence is based on the trial record.

### Charged Conduct

In October 2022, Minneapolis Police Department (MPD) officers responded to a residence in south Minneapolis after a 911 caller reported that Reynolds was at the address and had an outstanding warrant for his arrest. The residence belonged to the 911 caller's sister, who is Reynolds's aunt.

Officer A.E. entered the residence with her partner, Officer S.R. Officer A.E. observed Reynolds sleeping in a chair at the kitchen table. Reynolds's left hand was inside his pocket. There was a motorcycle helmet underneath Reynolds's right armpit area and a bag slung over his shoulder. Officer A.E. approached Reynolds while he was still sleeping, removed the motorcycle helmet from underneath Reynolds's armpit, and took Reynolds's left hand out of his pocket. Reynolds awakened, and the officers identified themselves as police. The officers informed Reynolds that he was under arrest based on an outstanding warrant. Reynolds somewhat resisted and began pulling away.

The officers tried to walk Reynolds towards the front door of the residence, but Reynolds repeatedly fell. In response, the officers decided to have Reynolds sit down on a

2

couch. As Reynolds began to sit, Officer A.E. felt something hard hit her leg. When Officer A.E. touched the right outer pocket of Reynolds's jacket, she immediately recognized that there was a gun inside. Officer A.E. unzipped Reynolds's jacket pocket and retrieved a loaded black Taurus 9-millimeter handgun.

The jury viewed footage from the body cameras worn by the officers. The footage showed one of the officers take the gun, remove the magazine and bullets, and then place the gun inside a brown paper bag. Law enforcement did not find any bullets, ammunition, holsters, or other firearm accessories in the bag that Reynolds had been carrying. At trial, Reynolds stipulated that he was ineligible to possess a firearm at the time of the offense.

The officers transported Reynolds to the Hennepin County Jail, but the jail refused to admit Reynolds because his eye was bruised and swollen shut. Law enforcement transported Reynolds to the hospital for treatment.

***Expert Testimony and Learned-Treatise Evidence***

The prosecution called a City of Minneapolis Forensics Division employee, E.O., as its final trial witness. E.O. works in the field operations unit, responding to crime scenes and conducting latent print analysis. In this case, she collected forensic evidence from the Taurus 9-millimeter handgun, as well as from the associated magazine and ammunition. E.O. swabbed the firearm for DNA and processed it for latent impressions. She did not find any latent impressions on the gun, but she did find some on the magazine. E.O. ran the impression through the automated fingerprint identification system (AFIS) and matched it to Reynolds's palm print card. She then conducted a side-by-side comparison and confirmed that the palm print found on the magazine matched Reynolds. The methodology

3

that E.O. used to match Reynolds's palm print to the impression she found on the handgun's magazine is called Analysis Comparison Evaluation and Verification (ACE-V).

On cross-examination, defense counsel questioned E.O. about the error rates among fingerprint examiners and about "close non-matches." E.O. explained that a "close non-match" is "an impression that may have some similarities with the known impression," but is not an identification because "[t]here are dissimilarities between that known impression and the latent impression." Through the learned-treatise hearsay exception,[1] defense counsel challenged E.O.'s direct testimony by reading into evidence an excerpt from an article published in the *Journal of Forensic Sciences* entitled, "For Fingerprint Error Rate on Close Non-Matches." The article detailed a study that "obtained false positive error rates of 15.9 percent and 28.1 percent on two fingerprint . . . close non-matches." E.O. did not recall there being any close non-matches in the AFIS when she conducted her analysis in this case.

During redirect examination, the prosecutor asked E.O. if she knew that the *Journal of Forensic Sciences* article referenced by defense counsel "involved a study of fingerprint analysis in China[.]" E.O. responded that she was "not aware of that." When asked if she was "familiar with the standards and practices that Chinese forensic analysis individuals use," E.O. said, "No. I'm not." In response to a question whether she knew that "participation in that particular study was actually mandated by the state in China," E.O. stated, "No." And, after the prosecutor inquired if E.O. was "aware that under the

---

[1] *See* Minn. R. Evid. 803(18).

methodology of that particular study that defense counsel listed, they allowed a match to be confirmed with only 12 minutiae," E.O. replied that she was "not sure how they conduct themselves there." E.O. explained that, in this case, she matched 24 "minutiae" between "the known print and the latent print" found on the magazine of the handgun.

The prosecutor also introduced learned-treatise evidence from a 2014 study conducted by the National Institute of Justice through the Miami-Dade Police Department. The prosecutor asked if E.O. knew that the study showed "a false positive rate in the ACE-V category of 0 percent[.]" E.O. replied that she did not "remember or recall everything from that article" but she "assumed" that the statement was an accurate interpretation of the study.

### Reynolds's Testimony

Reynolds testified as follows. The night before he was arrested, Reynolds went to his mother's home in north Minneapolis for a birthday party. He left the party after he had "an altercation" with his brother. Reynolds stated that he had been assaulted. After leaving his mother's house, Reynolds got on the bus and traveled to south Minneapolis, where he slept inside a friend's tent at a homeless camp until the next morning.

When Reynolds left the camp, he walked to his aunt and uncle's house. Reynolds said that he had a bag with him, but he did not possess a gun. Reynolds arrived at the house at 8:00 a.m. or 9:00 a.m. Reynolds told his aunt and uncle that he had been beaten up and that he believed his assailants were going to kill him "because two of them had guns." After throwing his bag on the ground and sitting in a chair, Reynolds stated that he was thirsty, and his aunt gave him something to drink. Reynolds drank the beverage and then "just

blacked out." When Reynolds woke up, the police were there to arrest him. Reynolds believed that someone had set him up. Reynolds testified that he did not know that there was a gun in his pocket until the police found it.

The state cross-examined Reynolds about the body-camera evidence, which showed that Reynolds had a bottle of water in his left pocket when the police first approached him. More specifically, the prosecutor asked if Reynolds had the bottle of water before he got to his aunt's house, and Reynolds replied: "If I had a bottle of water on me, I don't recall."

***Closing Arguments, Verdict, and Sentencing***

Before closing arguments, the district court instructed the jury that "the arguments or other remarks of anybody who is not a witness is not evidence" and that, "[i]f the attorneys . . . should make . . . any statement as to what the evidence is, which differs from [the jury's] recollection of the evidence, [the jury] should disregard the statement and rely solely on [its] own memory."[2]

The prosecutor began his closing argument by summarizing the elements of the offense and the state's evidence. During the state's closing, the prosecutor challenged the credibility of Reynolds's testimony, including as follows:

> The manner in which he talked about. Let's talk about that water bottle for a minute, going back to ability to relate. He's on the stand and I ask him about, you know, you said you only had a drink from your aunt. But who gave you these water bottles? *I didn't have any water bottles*. Well, Exhibit 1 shows the water bottle. Well, hold on. Now –

---

[2] Before opening statements, the district court had likewise advised the jury: "Nothing the attorneys say during the trial, including . . . closing arguments, is evidence."

(Emphasis added.) Defense counsel objected, contending that the prosecutor had misstated Reynolds's testimony. The district court overruled the objection and the prosecutor continued: "And then after I confront him with it, then he says, 'oh, you know what, I don't remember. I don't know remember [sic] where that water bottle came from.' Maybe it was put there too."

The prosecutor also questioned the credibility of the defense's learned-treatise evidence:

> As I pointed out in the 2014 empirical study of people in the United States, all of them having at least one year of experience in doing the job that the study is about, found a 0 percent percentage rate. *The study in the* Journal of Forensic Sciences *is—is a study that was done in China under different—under different methodologies.*

(Emphasis added.) Defense counsel objected that the prosecutor's argument "[m]isstates," and the district court sustained the objection, without requiring further explanation by defense counsel. The prosecutor resumed arguing:

> Both of them purporting to use the ACE-V methodology. However the—that journal itself recognizes that the individuals they selected were of less experience than the ones that did the National Institute for Justice study. Not only that, but they were using a form and program that they were brand new to. *And in China, they have a threshold to find a match, which was less than half of the threshold that – or* [E.O.] used.

(Emphasis added.)

Defense counsel objected again, reiterating that the prosecutor was misstating the evidence. After asking the parties to approach the bench, the district court ordered the prosecutor to restate his last comment. The prosecutor then resumed:

That study in the *Journal of Forensic Sciences*, that study in China used a lot—their method or their analysis allowed for a threshold and a finding of a match with only 12—only 12 minutiae matched. And [E.O.]—and you can see in Exhibit 8, she used 25 indicia. 25 match minutiae in there.[3] More than twice what was allowed in this other study.

During Reynolds's closing argument, defense counsel addressed the state's assertions about the bottle of water and the learned-treatise evidence. As to the bottle of water, defense counsel argued:

The statement about the water bottle in his pocket, like, "Oh, did you remember it was a cup?" You know, "Did you get the water out of a cup, or was it a water bottle?" And he remembered it as a cup. Okay. That doesn't mean that Mr. Reynolds is guilty. Every single witness that came up here had issues with their memory and remembering things. Officer [A.E.], if you recall, she remembered just one dog. And then she, you know, upon seeing the video and seeing the stills she remembered more detail. So just because Mr. Reynolds, you know, didn't remember getting water from a cup versus water from a bottle, that's not a reason to find him guilty.

And additionally if you look at Officer [S.R.]'s body camera video, which is I believe Exhibit 3, you can see in the background . . . that Officer [A.E.] is helping Mr. Reynolds drink from a water bottle in the background. And Officer [A.E.] talked about getting a water bottle that's very similar to the one in this pocket from his aunt.

. . . I say this to emphasize that when we're going through these facts and . . . when we're applying the presumption of innocence, . . . it's not consistent with the presumption of innocence to jump all over Mr. Reynolds for not remembering a cup versus a water bottle and say he's not credible. And yet you have an officer, you know, not remembering the address or not remembering how many dogs.

---

[3] Although it does not alter our analysis in this case, we note that, when the prosecutor questioned E.O. on redirect examination about Exhibit 8, E.O. testified that she matched 24 minutiae between the known print and the latent print that she found.

. . . [E]very witness that we saw up here needed to refresh their recollection. So when we apply the presumption of innocence, keep that in mind.

As to the learned-treatise evidence, defense counsel asserted:

And let me just address the . . . issue in terms of the *Journal of Forensic Sciences* article versus the Miami-Dade study. . . . [T]he key difference there is not that like, you know, these computer illiterates, you know, Chinese nationals were working . . . in that study. The key issue or difference between those two studies was that the Miami-Dade study was just general. It was just like the regular flow of fingerprint comparison.

What was different in the *Journal of Forensic Sciences* article was that that was specifically testing close non-matches. That's the difference. And Examiner [E.O.] talked about the fact that the AFIS process produces similar prints.

Based on the foregoing and other arguments,[4] defense counsel asked the jury to return a verdict of not guilty.

The jury found Reynolds guilty as charged. The district court sentenced Reynolds to 60 months in prison.

This appeal follows.

---

[4] Defense counsel maintained that Reynolds "did not knowingly possess [the] gun" because he was "totally unconscious and [was] profoundly asleep" when police encountered him at his aunt's house. Defense counsel implied that someone else had placed the gun in Reynolds's pocket because, at the time, Reynolds was "vulnerable to whatever his aunt or an uncle want[ed] to do to him" and the gun was found in a place accessible to his aunt. Defense counsel asserted that there was "no indication or . . . accessory that would point to Mr. Reynolds owning a gun" because law enforcement did not find any extra clip or holster on Reynolds's person. And defense counsel challenged the credibility of the fingerprint analysis that E.O. had performed, contending that "fingerprint examination does not have scientific standards."

**DECISION**

Reynolds asserts that he is entitled to a new trial because the prosecutor's closing argument misstated Reynolds's testimony about the bottle of water in his jacket pocket and misstated learned-treatise evidence that was not admitted into the record. Reynolds contends that this amounts to prejudicial misconduct "because the prosecutor designed his argument to influence the jury based on a falsehood." The state responds that the prosecutor's objected-to comments did not play a substantial part in influencing the jury to convict. We agree with the state.

"With respect to claims of prosecutorial misconduct arising out of closing argument, we consider the closing argument as a whole rather than focus on particular phrases or remarks that may be taken out of context or given undue prominence." *State v. Johnson*, 616 N.W.2d 720, 728 (Minn. 2000) (quotation omitted). "A proper closing argument should focus on the evidence and reasonable inferences drawn from the evidence." *State v. Yang*, 627 N.W.2d 666, 679 (Minn. App. 2001), *rev. denied* (Minn. July 24, 2001). "The prosecutor may analyze the evidence and vigorously argue that defendant and his witnesses lack credibility." *State v. Dupay*, 405 N.W.2d 444, 450 (Minn. App. 1987) (quotation omitted). But "[p]rosecutors may not make arguments that are not supported by evidence or that are designed to inflame the passions and prejudices of the jury." *State v. Bobo*, 770 N.W.2d 129, 142 (Minn. 2009). And "[a] prosecutor commits misconduct by intentionally misstating evidence." *State v. Mayhorn*, 720 N.W.2d 776, 788 (Minn. 2006); *see also State v. Peltier*, 874 N.W.2d 792, 805 (Minn. 2016) ("It is unprofessional conduct for the

prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw." (quotation omitted)).

"Even if established, prosecutorial misconduct does not in and of itself require a new trial." *State v. Steward*, 645 N.W.2d 115, 121 (Minn. 2002). "If [an appellate court] conclude[s] that the State committed prosecutorial misconduct, [the appellate court] will grant a new trial when the misconduct impaired the defendant's right to a fair trial." *State v. Graham*, 764 N.W.2d 340, 347 (Minn. 2009) (quotation omitted). In particular, "[w]hen an objection is made and [the appellate court] conclude[s] the prosecutor committed misconduct, [the appellate court] appl[ies] a two-tiered harmless-error analysis." *State v. Jackson*, 773 N.W.2d 111, 121 (Minn. 2009). *But see State v. Chauvin*, 989 N.W.2d 1, 32 n.8 (Minn. App. 2023) ("The supreme court has questioned whether this two-tiered approach is still good law, while declining to decide the question."), *rev. denied* (Minn. July 18, 2023), *cert. denied*, 144 S. Ct. 427 (2023).

"[I]n cases involving unusually serious prosecutorial misconduct," appellate courts have "required certainty beyond a reasonable doubt that the misconduct was harmless before affirming." *State v. Caron*, 218 N.W.2d 197, 200 (Minn. 1974), *abrogated on other grounds by State v. Ramey*, 721 N.W.2d 294, 298–99, 299 n.4 (Minn. 2006) (observing that "some [Minnesota Supreme Court] cases [had] used the *Caron* standard to analyze unobjected-to prosecutorial misconduct," "conclud[ing] that appellate courts should use the plain error doctrine when examining unobjected-to prosecutorial misconduct," and "leav[ing] for another day the question of whether the *Caron* two-tiered approach should continue to apply to cases involving objected-to prosecutorial misconduct"). "On the other

hand, in cases involving less serious prosecutorial misconduct[,]" we instead consider "whether the misconduct likely played a substantial part in influencing the jury to convict." *Id.* Minnesota "caselaw does not provide guidance on what constitutes 'unusually serious' or 'less serious' conduct." *State v. Glaser*, No. A18-0541, 2019 WL 1320583, at *2 (Minn. App. Mar. 25, 2019) (nonprecedential opinion cited as persuasive authority per Minn. R. Civ. App. P. 136.01, subd. 1(c)).

Reynolds does not argue that this case involves "unusually serious prosecutorial misconduct" that requires applying the harmless-beyond-a-reasonable-doubt standard. *Caron*, 218 N.W.2d at 200. Instead, Reynolds maintains that "[t]he misconduct is prejudicial under even the less-serious standard because it likely played a substantial part in influencing the jury to convict." Although the state notes Reynolds's concession that the less-serious standard applies here, the state also contends that Reynolds's "claim fails under both the substantial-part test and the harmless-beyond-a-reasonable-doubt test." We agree with Reynolds that the less-serious standard applies here. *Cf. id.* at 199–200 (applying "the test of whether the misconduct likely played a substantial part in influencing the jury to convict" where "the prosecutor erred by alluding in his closing argument to the failure of defendant to call certain alibi witnesses"). But, as explained below, we otherwise conclude that Reynolds's arguments are unavailing.

***The prosecutor's misstatement of Reynolds's testimony did not play a substantial part in influencing the jury to convict.***

The prosecutor committed misconduct by intentionally misstating Reynolds's testimony about the bottle of water. *See Mayhorn*, 720 N.W.2d at 788. More specifically, in response to the prosecutor's cross-examination about when he obtained a bottle of water that body-camera footage showed was in his left pocket as law enforcement first approached him, Reynolds stated: "If I had a bottle of water on me, I don't recall." But during closing argument, the prosecutor told the jury that Reynolds had denied having the bottle of water, despite the body-camera footage showing that the bottle was in Reynolds's possession. This misstatement of Reynolds's testimony was prosecutorial misconduct. *See id.*; *see also Peltier*, 874 N.W.2d at 805; *Bobo*, 770 N.W.2d at 142. Because Reynolds objected and we agree that the misconduct was less serious, we must consider "whether the misconduct likely played a substantial part in influencing the jury to convict." *Caron*, 218 N.W.2d at 200.

In applying the less-serious standard and evaluating whether prosecutorial "misconduct likely played a substantial part in influencing the jury to convict," *Caron* relied on an analysis of the strength of the state's evidence. *Id.* ("In applying this test, we might conclude that the error was prejudicial were we to agree with defendant's argument that the evidence against him was weak. However, we believe that the evidence against defendant was strong."). Along with evaluating the state's evidence, the Minnesota Supreme Court has also applied the less-serious standard by looking to the pervasiveness of the misconduct and to whether the district court provided the jury cautionary instructions

13

about remarks by the attorneys. *See State v. McDaniel*, 777 N.W.2d 739, 752–53 (Minn. 2010) (concluding that "misconduct did not play 'a substantial part in influencing the jury to convict'" when "[t]here was ample evidence that supported McDaniel's conviction for aiding and abetting first-degree premeditated murder, and the misconduct was sporadic, minimal, and rectified by the court's constant admonition that arguments or statements by the lawyers are not evidence" (quoting *Caron*, 218 N.W.2d at 200) (other quotation omitted)). And, in an opinion issued before *Ramey*, this court considered whether a defendant "had the opportunity to rebut" in "[a]pplying the second *Caron* standard" to an unobjected-to claim of prosecutorial misconduct based on the state's closing argument, which referred to matters outside the trial record. *State v. Eggert*, 358 N.W.2d 156, 161–62 (Minn. App. 1984) (also noting that "the jury was instructed to decide the case solely on the facts before it" and that the prosecutor's "single improper reference" in closing argument was "isolated").[5]

Here, because the state's trial evidence was strong, the prosecutor's misstatement was brief, the district court provided cautionary instructions to the jury, and defense counsel rebutted the prosecutor's argument, we conclude that the misconduct did not substantially influence the jury to find Reynolds guilty.

---

[5] *Cf. State v. Davis*, 735 N.W.2d 674, 682 (Minn. 2007) (addressing plain-error review of prosecutorial misconduct and explaining that, "[i]n assessing whether there is a reasonable likelihood that the absence of the misconduct would have had a significant effect on the jury's verdict, we consider the strength of the evidence against the defendant, the pervasiveness of the improper suggestions, and whether the defendant had an opportunity to (or made efforts to) rebut the improper suggestions").

The state presented a strong case to the jury. Reynolds stipulated that he was ineligible to possess a firearm at the time of the offense. The body-camera footage and corroborating testimony established that Reynolds had a gun on his person. Reynolds chose to testify and did not deny that the handgun was in his pocket. Reynolds also stated that the individuals that beat him up the night before had guns and intended to kill him. It was therefore reasonable for the jury to infer that Reynolds was in actual possession of the firearm, perhaps to protect himself from the people who had attacked him. Although Reynolds claimed that someone had set him up after his aunt gave him something to drink and he "blacked out," and despite Reynolds's claim that he did not know there was a gun in his pocket until law enforcement found it, E.O.'s testimony that the palm print found on the magazine matched Reynolds was strong evidence that Reynolds had knowingly exercised dominion and control over the gun before his arrest.

The prosecutor's misstatement of Reynolds's testimony was brief. And although the district court overruled Reynolds's objection to the prosecutor's misstatement, the prosecutor nevertheless rephrased his argument, acknowledging that Reynolds testified that he did not remember where he had gotten the bottle of water. As a result, the prosecutorial misconduct was not pervasive.

The district court properly instructed the jury. Before opening statements, the district court told the jurors that the attorneys' closing arguments are not evidence. And before closing arguments, the district court again instructed the jury that the attorneys' arguments are not evidence and that they should disregard any statement that differs from their recollection of the evidence. Appellate courts "assume that the jury followed the

court's instructions and properly considered the evidence." *State v. Vang*, 774 N.W.2d 566, 578 (Minn. 2009).

Finally, defense counsel thoroughly rebutted the prosecutor's misstatement of Reynolds's testimony. Defense counsel spoke at length about the bottle-of-water issue, contextualizing the testimony and asserting that Reynolds's failure to recall neither undermined his credibility nor amounted to proof of his guilt.

Given the strength of the state's trial evidence, the brevity of the prosecutor's minimal and isolated misstatement, the district court's cautionary instructions to the jury, and defense counsel's rebuttal to the prosecutor's remarks, the prosecutor's closing argument about Reynolds's testimony did not substantially influence the jury to convict.

### *The prosecutor's misstatement of the learned-treatise evidence did not play a substantial part in influencing the jury to convict.*

The prosecutor also committed misconduct by referencing in closing argument information challenging the defense's learned-treatise evidence about the *Journal of Forensic Sciences* article, notwithstanding that the referenced information had not been admitted into evidence. *See Mayhorn*, 720 N.W.2d at 788. Indeed, the state concedes that "[i]n closing argument, the prosecutor appeared to be treating his questions as equivalent to evidence read from a journal article pursuant to the learned-treatise exception."

In particular, prior to closing argument, the prosecutor failed to elicit any testimony from E.O. to confirm the state's challenges to the defense's learned-treatise evidence, which focused on the standards, practices, and methodology that Chinese forensic analysts used in conducting the study underlying the *Journal of Forensic Sciences* article. And at

no point did the prosecutor read into evidence information about where the study was conducted and what methodologies were used. But the prosecutor argued in closing that the study in the *Journal of Forensic Sciences* article was done in China under different methodologies. The district court sustained defense counsel's objection to this argument. The prosecutor nevertheless persisted, telling the jury that fingerprint analysts in China have a lower threshold for confirming matches than what is used in the ACE-V methodology that E.O. employed. Defense counsel again objected, and the district court ordered the prosecutor to restate his last remark. The prosecutor then asserted that the *Journal of Forensic Sciences* study "allowed for a threshold and a finding of a match with only . . . 12 minutiae matched," despite E.O.'s testimony that she was "not sure how they conduct themselves there."

Simply put, there was no evidence in the record supporting any of these attempts by the state to challenge the *Journal of Forensic Sciences* study. The prosecutor's misstatements of the learned-treatise evidence was therefore prosecutorial misconduct. *See Mayhorn*, 720 N.W.2d at 788; *see also Peltier*, 874 N.W.2d at 805; *Bobo*, 770 N.W.2d at 142. In light of this objected-to misconduct and our conclusion that it was less serious, we again consider the strength of the state's evidence, the pervasiveness of the misconduct, the presence of cautionary instructions, and the defense's opportunity to rebut in determining whether the learned-treatise misstatements "likely played a substantial part in influencing the jury to convict." *Caron*, 218 N.W.2d at 200; *see also McDaniel*, 777 N.W.2d at 752–53; *Eggert*, 358 N.W.2d at 161–62.

17

As discussed above, the state's evidence was strong and the district court twice instructed the jury that the lawyers' arguments are not evidence. The prosecutor's misstatements about the learned-treatise evidence were more pervasive than his singular misstatement of Reynold's testimony about the bottle of water. The prosecutor made three separate arguments that were not supported by evidence, despite defense counsel's repeated objections, one of which the district court sustained. But defense counsel's closing argument directly rebutted the prosecution by addressing the *Journal of Forensic Sciences* article, rejecting the state's proposed distinction about the methodology employed by the "Chinese nationals [who] were working . . . in that study" and explaining that the defense's learned-treatise evidence was credible over the state's "Miami-Dade study" because it "was specifically testing close non-matches." Thus, despite the pervasiveness of the prosecutor's misstatements of the defense's learned-treatise evidence, we cannot say that this prosecutorial misconduct likely played a substantial part in influencing the jury to find Reynolds guilty. *See Caron*, 218 N.W.2d at 200.

**The jury's verdict was surely unattributable to the prosecutorial misconduct.**

Even assuming without deciding that the overall prosecutorial misconduct in this case was "unusually serious" and that the more exacting harmless-beyond-a-reasonable-doubt test applies, we would still affirm. *See State v. Carridine*, 812 N.W.2d 130, 146 (Minn. 2012) (declining to "reach the issue of the continued applicability of the *Caron* test to objected-to prosecutorial misconduct" based on the conclusion "that the one instance of objected-to prosecutorial misconduct here is harmless even under the standard for more serious misconduct"); *see also State v. Whitson*, 876 N.W.2d 297, 304 (Minn. 2016)

(explaining that "[p]rosecutorial misconduct is harmless beyond a reasonable doubt if the jury's verdict was surely unattributable to the misconduct," noting that "the prejudicial effect of misconduct can be cured by proper instructions to the jury," and observing that "[f]actors relevant to the determination of whether prosecutorial misconduct is harmless beyond a reasonable doubt include how the improper evidence was presented, whether the State emphasized it, whether it was highly persuasive, and whether the defendant countered it," as well as "[t]he strength of the other evidence supporting the verdict," although the last factor "is not dispositive" (quotation omitted)).

Here, along with the overall strength of the state's trial evidence, we are persuaded that the jury's verdict was surely unattributable to the misconduct based on the defense's ability to counter the prosecutor's misstatements, the relatively collateral nature of the misstated evidence, and the district court's cautionary instructions—which the district court provided both before opening statements and before closing arguments—that the attorneys' remarks are not evidence and the jury should disregard attorney statements that differ from the jury's recollection of the evidence. *See State v. Matthews*, 779 N.W.2d 543, 550 (Minn. 2010) ("We presume that juries follow instructions given by the court.").

In sum, "consider[ing] the closing argument as a whole rather than focus[ing] on particular phrases or remarks that may be taken out of context or given undue prominence," *Johnson*, 616 N.W.2d at 728, the totality of the misstatements in the prosecutor's closing argument does not persuade us that "the misconduct impaired [Reynolds's] right to a fair trial," *Graham*, 764 N.W.2d at 347. At bottom, despite Reynolds's defense that he did not knowingly possess the gun, the jury found Reynolds guilty of possession of a firearm by

19

an ineligible person based on direct evidence that the gun was in Reynolds's zippered jacket pocket with his palm print on the magazine. Because we conclude the prosecutorial misconduct here did not substantially influence the jury to convict Reynolds and that the jury's verdict was surely unattributable to the misconduct, Reynolds is not entitled to a new trial.

**Affirmed.**